# ORIGINAL

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

Rhonda D. Lora-Serrano                              "JURY TRIAL DEMANDED"

      Plaintiff,

  -against-

The Port Authority of New York and New Jersey



     Defendant

-------------------------------------------------------------X

### JURISDICTION

This action is brought pursuant to Title VII of the Civil Rights Act of 1964 as amended, for

employment discrimination. Jurisdiction is specifically conferred on this Court by Title VII of

the Civil Rights Act of 1964 42 U.S.C. §§ 200e to 200e-17. Equitable and other reliefs are also

sought under:

1.     Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621

634.

2.     Americans with Disabilities Act of 1990, as codified 42 U.S.C. §§ 12112 – 12117

3.     New York State Human Rights Law, N.Y. Exec. Law, §§ 290 to 296

4.     New York State Human Rights Law, N.Y. City Admin. Code § 8-101 to 131



1

     5.     First Amendment I (1971), Right to Free Speech

     6.     Union Members' Bill of Rights under The Labor Management Reporting and

Disclosure Act (LMRDA).

     7.     Lilly Ledbetter Fair Pay Act of 2009

     8.     The Whistle Blower Protection Act of 1989

This is a prima facie case of race, age, disability discrimination , and retaliation under Title VII

of the Civil Rights Act of 1964 42 U.S.C.  §§ 200e to 200e-17, in regards to which I am a

member of each protected class; the Americans with Disabilities Act of 1990, as codified 42

U.S.C. §§ 12112 – 12117, the New York State Human Rights Law, N.Y. Exec. Law, §§ 290 to

296; the Union Members' Bill of Rights under The Labor Management Reporting and Disclosure

Act (LMRDA); the First Amendment I (1971), specifically, Right to Free Speech; and the Lilly

Ledbetter Fair Pay Act of 2009,  as follows:

     1.     <u>I am a Black woman and African American Slave Descendant</u>

     2.     <u>I was fifty (50) years old</u> at the time of The Port Authority of New York and New

Jersey (PA) having acted as Judged, Jury and Executioner and enforced against me its September

18, 2008 subjection of me to a wholly unwarranted and deliberately malicious <u>immediate</u>

Suspension without Pay.  This said punishment had been specifically enforced upon me by Ms.

Jane Hegarty, Manager of the PA's Engineering Department, while without her having afforded

me a perquisite Hearing to which I had been entitled; in advance of her having taken any such

action against me, as per  CWA Local 1032 (CWA) related contract stipulations.

3.     I had been advised by the PA in a letter that I had received from it in late October 2009 that it had terminated my approximate seventeen and one-half (17 ½) years tenure with it on October 16, 2009, while it had enforced its above said wholly unwarranted and deliberately malicious Suspension without Pay against me on September 18, 2008.  In light of these facts, the PA it had enforced its Suspension upon me for an excess of one (1) year.

4.     The PA had enforced its above said wholly unwarranted punishment(s) against me with the deliberate and malicious intents of its having personally, emotionally, mentally and physically, and spiritually destroyed me as well as quelled any and all of my life's aspirations and/or related opportunities.  Moreover, it had also discarded my person, my life, and my rights with the full expectation that its such deliberate and intentionally malicious punishments against me would have wrought upon me the immeasurable, irreconcilable, and irreparable life-altering and personally devastating hardships, personal harms, pains, suffering, and losses that have ensued.  Given, furthermore, the following conditions under which the PA had enforced its such punishments against me, it had acted as well authorized its own self in the capacities of its having been Judge, Jury, and Executioner:

(a) It had denied me my CWA contract stipulated Union Member Right to have been afforded a prerequisite Hearing in advance of its having enforced any such action against me or any due process, whatsoever; and

(b) It had denied me my right to have been at the time of its having enforced against me it's said September 18, 2008 action(s), issued to me the alleged specified charges; in violation of my Union Members' Bill of Rights under the Labor Management Reporting and Disclosure Act (LMRDA).

3

5.     The PA had not issued to me the above said after-the-fact wholly falsified and fabricated alleged specified charges against me until approximately (1) month later, on October 18, 2008.  Moreover, it had done so by sole means of its having included them as part of a document that it had issued to me on October 18, 2008, via Express Mail, apprising me of its having scheduled an alleged related after-the-fact Hearing against me for October 24, 2008, just five (5) workdays later.  This had  also constituted the PA's further violation, total disregard and disrespect of my related CWA contract stipulated rights, which had required it to provide me notice of the Hearing, at least, eight (8) workdays in advance.

6.     CWA had mutually enforced the PA's said deliberately malicious and intentional September 18, 2008 punishment(s) against me  by its having deliberately failed, refused and denied me the related rights and protections to which I had been at that time entitled under its contract.  Furthermore, it had engaged in the illegal conduct of its having signed a document on behalf and at the direction of the PA requiring that it had acted as a witness against me.  The following serve to further demonstration s the longstanding existences of conspiracy, complicity and collusion between the PA and CWA against me:

(a) CWA's own Position Statement to the Equal Employment Opportunity Commission (EEO C) in this matter had consisted almost entirely of the PA's above said after-the-fact wholly falsified and fabricated charges against me, and

(b) The fact that CWA had in its said position statement, additionally, lied and falsely asserted and alleged to the EEO Commission that I had signed a Waiver of My Rights.

4

7.     The PA's said after-the-fact October 24, 2008 scheduled Hearing and related wholly falsified and fabricated charges against me had been purely self-serving to it and CWA, given that they had been mutually complicit in their denials to me of any due process, whatsoever; respective of the undue punishment(s) already enforced upon me by the PA as Judge, Jury and Executioner.  They had been products of the PA's and CWA's conspiracies against and, moreover; specifically, designed and intended to by them for the use of concealing their deliberate and malicious wrongdoings against me as well as inflicting upon me the added injustice of my of their having denied me any recourses, whatsoever.

8.     The PA and CWA had been mutually complicit, already denied me any due process, whatsoever, and enforced their said deliberately malicious and intentional punishment(s) upon me; acting as Judge, Jury, and Executioner.  Therefore, they had solely intended to have utilized their said after-the-fact Hearing and wholly falsified and fabricated alleged specified charges against me in order to have made seemingly justifiable and concealed their mutual wrongdoings against me, assured that I would have had no recourses; whatsoever, and saved themselves harmless from any related legal consequences and/or related penalties, whatsoever.

9.     Many of the falsehoods represented by the said after-the-fact fabricated charges are, in fact, clearly discernable and demonstrated by the repetitions of and contradictions between them and their alleged substantiating documents.

10.    Throughout the entire length of my above said tenure, the PA had subjected me to relentless retaliations for my inabilities as well as unwillingness to have, as a fellow Human Being, acquiesced to the precepts of its commonly practiced racism and related deemed superiority over its Black employees and me; in particular.  It had done so by means of its having endlessly and most aggressively ostracized me, harassed me, withheld me, disrespected me, personally abused , violated me and otherwise imposed and enforced against me all manners of dehumanization, hardships, pains and suffering and other racially disparate treatments.

11.    Although the PA's said deliberately malicious September 18, 2008 action(s) against me had been, in fact, representative as well as a culmination of and products of its persistent racism against me, they had, nonetheless, constituted; additionally, violations of my rights under The Whistleblower Protection Act of 1989 .  Among other related such events that had occurred on the September 18, 2008 date of the PA's said retaliatory action(s) against me, I had advised its Help Desk that my alleged PA assigned User Account was being accessed by others.

12.    On September 17, 2008 I had been unable to have logged into my alleged PA assigned computer and had contacted the PA'S Help Desk for assistance  following my having requested and obtained the prior permission of Ms. Karen Hoppe , who had been Chief Engineer. Because PA's Help Desk Representative had been unable to make a remote connection to my alleged personally assigned PA computer, it had determined the dispatch of a technician that following day to be necessary.

6

13.    The PA had previously placed my User Profile on a number of unassigned computers without my prior permission or consent and, most importantly, over my objections; based upon which, I had desperately appealed to Ms. Patti Miller of its Executive Offices via email and requested the removals of my User Profile from the said unassigned extra computers. Ms. Miller had not responded to my said email, whatsoever, as had been customary of the PA.

14.    Given the very substantial documents, accounts, computer hackings and related Official PA Records falsifications that the PA had subjected me to in the course of my prior assignment to its Contract Unit  about which I had complained to it, I had specifically appealed to Miller to have not made me openly vulnerable to subject treatments.   Additionally, I had pointed out to her that no member of the said Clerical staff member had been up to that point ever required by the PA to have performed their work on or otherwise utilized a computer that it had not, alleged; at least, to have been personally assigned them by it.  Moreover, I had also point out to Ms. Miller that there had been no good or justifiable reason for the placement of my said User Profile on multiple computers given that it had only been humanly possible for me to performed work one computer at a time.

15.    On the above said September 17, 2008 date and day before the PA's having enforced its said deliberately malicious action against me, nonetheless, Ms. Demarest; my, then, Supervisor, had directed me to have signed into one of the above  mentioned unassigned computer and I had complied. Ms. Demarest had directed to allow her to have sat at the said unassigned computer that I had just logged into because I had been unable to have into the PA's network. Following my having done so, Ms. Demarest had advised me in rude and hostile manners that, 'she had not needed me to have been standing over shoulders'.  In response, I had advised Ms. Demarest that I had possessed every right to witness what she had been doing and

wanted to have known, given that s it had been my alleged personally assigned PA User Account that she had been at that time logged into. Clearly disgruntled, Ms. Demarest had, then, immediately logged out of my said alleged personally assigned PA User account and nastily told me to have just waited for the previously mentioned technician to arrive that following day.

16.    On September 18, 2008, I had received a call from the security desk advising me as to the said technician's arrival at about 9:00 A.M. and escorted him up to the third floor Three Gateway Plaza in Newark New Jersey where the PA had assigned me.

17.    Most desperate to have obtained some type of protections and security against the below described relentless onslaught of computer, documents and account hackings that I was subjected by the PA, I had explained my situation to the said technician on our way up in the elevator, in the hopes that he would help me. I had become immediately aware that I had made a mistake by my having confided in the said technician due to an incident having at that time occurred.

18.    Within minutes of our arrivals to the said Contract Unit, I had become immediately aware that it had been a mistake for me to confide in the said technician. As he and I had passed Ms. Terry Demarest (Black), my, then, Supervisor; on our way to my desk, he had said to her, "You see my eyes, right". Ms. Demarest had been promoted to the Contract Unit as my immediate Supervisor by Ms. Jane Hegarty, to who she had been immediately previously assigned and employed by the PA as an Assistant.

8

19.    In addition to the above mentioned and below described substantial hackings and related falsification and alterations of  its official physical as well as computerized Records in my disfavor, I had not been able to have secured my work nor any personal possessions while I had been at work.  The PA had permitted a high-level Professional staff member to break into my desk, following a one (1) day absence by me from the office, which two (2) Black and (1) white similarly situated PA employees had been present to have witnessed and apprised me of. Nonetheless, Ms. Marcia Moore, a longstanding Administrator with the PA's Engineering Department, had to me a lie in regards to the incident and falsely alleged a Lock Smith to have done so; instead.

20.    The PA had uniquely precluded me from my having made any direct contact with its Help Desk and, instead, required me to have addressed any computer related issues directly with my immediate Supervisor(s), whom had not been hired nor assigned by the it in any technical capacities, which constituted violations of its own related written computing policies.

21.    Resulting from the above stated, I had been left by the PA without any means of protections from its relentless and most aggressive onslaughts of related hackings, and computerized as well as physical Official Records tampering, alterations and falsifications against me other than Screen Prints.  Further to which, I had confided all of this in the said technician.

22.    The said Screen Prints had not and could not have in any way helped or protected within the PA's employ because it had sought and been determined to have harmed me. Nonetheless, however they do confirm the true and exact times of work actually performed by me and filed by me as well as the statuses of the computer(s) that the PA had required me to have utilized and related lacks securities on them, etc.

23.   Less than ten (10) after the said technician's arrival at my workstation, he had been approached by Ms. Demarest and Ms. Karen Hoppe, Chief Engineer of the Contract Unit, and asked to have accompanied them into the Conference Room; although he had been dispatched by the PA's Help Desk for the specific purpose of his having repaired my computer.

24.   The said technician had, then, emerged from the PA's said Conference Room approximately one-half ( ½) or more later and advised me that he had been instructed to at that time authorize Ms. Denise Jones on my alleged PA assigned personal computer as an Administrator.  Ms. Jones (Black) had been as of the September 18, 2008 date in question assigned to the PA's Contract Unit for less than a Year and had filled a Senior Secretary position that vacated by a Ms. Barbara McNeil (white).

25.   I had been required to train Ms. Jones in all aspects of contract management and preparation, the Calligo Contract Management System, basic word processing functions as well as in other regards and had been made subservient to her as well as greatly harassed by her. Ms. Jones had been a very poor student in that she and had a very nasty and ungrateful attitude, whereby she had demanded me to have come to her desk and personally instructed her, after I had already thoroughly trained her as well as provided her related written instructions; literally, every five (5) minutes.

26.   Additionally, Ms Jones had been unable to have retained information and/or followed instructions including written ones that I had provided to her and possessed a very low aptitude for computer programs and processes and had been very lacking in basic word processing skills.  Ms. Jones had spent the better part of her PA workday having falsified the Contract Unit's Work Log as her having performed jobs and related contracts that had not existed, not been actually assigned, and/or had already been completed; or Ms. Demarest would initial or sign for the said Work Log for her.

27.   On numerous occasions, I had overheard Ms. Jones and Ms. Demarest openly discussing their takeovers of my personal and password protected Contract Notes document, wherein I had detailed the work performed by me on each contract and, then, copied into the 'Comment' section of the appropriated contract, their alterations, replacements, deletions, etc. of related documents.  The PA had clearly supported, approved and orchestrated the most cruel, humiliating, and harassing actions that had been enforced against me by Ms. Jones and; exceedingly so, by Ms. Demarest.

28.   On one particular occasion, I had been specifically requested the PA's Administrative Offices to have picked up important personal employee in Manhattan, on my way from New York to New Jersey; although he PA's common practices as well as CWA's written policies had afforded employees to have taken care of such employee personal business matters. Nonetheless, Ms. Demarest had endlessly harassed me on an everyday basis and, as such, required me to have, instead, gone straight to work in New Jersey from New York, travel back New York during my lunch hour and, then, travel back to work in New Jersey; based upon which, I had been, of course, micromanaged, reprimanded and ostracized.  The PA had subsequently deemed me to have stolen and/or otherwise abused its time.

29. Ms. Demarest had alleged the PA's Contract Unit to have required me to prepare emergency an addendum that it had allegedly required to have gone out that morning, although its Senior Secretary; Ms. Denise Jones, had been present, and Ms. Karen Hoppe had backed up her claim. However, I had looked up the contract number among what had been left of my said hacked related Contract Notes and discovered that the PA had already awarded the said contract i approximately two (2) years earlier. As the result of my having brought this to Ms. Hoppe's attention no such emergency addenda had gone out nor had anyone provided me with any explanation, whatsoever.

30. Similarly I had overhear Ms. Hoppe having been engaged with Ms. Demarest and Ms. Jones in a hacking discussion at the time of my returned to my desk in order to have logged out as per Ms. Hegarty's related threats to me following her having subjected me to the PA's said wrongful and deliberately malicious action(s).

31. The PA had required me to scan documents exclusively on an alleged group computer from the time of its relocation of me to its FS Unit in early August 2007 up to its March 19, 2008 subjection of me to a more than three (3) month Constructive Termination. Moreover, it had not designated a personally assigned computer for me until January 2008, which except during my lunch hours, it had denied me the right to even, sit at. Yet, under such circumstances, it had, nonetheless, granted specialized access and authorization to other peoples Credit Card information under my allegedly personal assigned PA User Account; without my knowledge, without my permission and its having had any good cause for its having done so whatsoever. I had been made most painfully aware by the PA's as to its contempt for me, could not help but to have become immediately fearful, therefore, for my immediate welfare and safety in regards to its motivation(s) for having done so.

12

32.   I had never been trained nor worked in that capacity, which I had immediately advised the technician having apprised me of the said specialized Credit Card access and authorizations that had been granted to my alleged personally assigned PA User account as well as requested the immediate removals of.  Not too long afterwards, the PA had subjected me to the above said March 19, 2008 Constructive Termination.

33.   Given the above stated facts, I had asked the previously mentioned technician why he had been authorizing Ms. Jones as an Administrator on my alleged personally assigned PA computer and he had alleged to have being doing so in the case that I had needed updates.  At this point, I had then, advised the said technician that Ms. Jones had not been an Administrator nor employed by the PA in any technical capacity, whatsoever, and that the PA had already assigned her a personal computer.  The said technician had responded by his having asserted to me that the PA had been my bosses of my company and that they could have done whatever they had wanted to.

34.   Very disturbed by this, I had advised the technician that it had been against the PA's written computer policies and procedures for to have designated Ms. Jones as an Administrator n my alleged personally assigned computer insofar as I knew and that, moreover, I had possessed a copy of it.  I had advised Ms Demarest that I was going to have taken my morning break and had requested the name of the said technician before I had gone on it and he told me to, just, call him "D" and said that it had been easy to remember.

35.   During my approximately ten (10) minute break, I had, then, called and apprised the CWA's Engineering Representative as to the situation and her sole response had been that, 'she had hoped that the PA had intended to have blamed me for anything'.  This had been while it's Shop Steward, Ms. JoAnne Hilton had advised me, shortly after her having on September 18, 2008 signed as a witness against me for the PA, which it had been against CWA's policies for more than one (1) User to be placed on any of its member's personally assigned PA computers.

36.   Prior to my having left for lunch, I had, then, gone over to Ms. Demarest's workstation, where the said technician and been and had requested his full name in order to have formally documented his advice to me and he had refused to have given it to me.  Upon my return from lunch, however,  the said technician had suddenly and voluntarily alleged that he had so authorized Ms. Jones of my alleged personally assigned PA computer, that no one had directed him to have done so and, moreover, he; either, already had, or was about to have removed it.

37.   Subsequently, the said technician had then admonished me and stated to me that I had not wanted the PA's agency-wide Novel User Account and MacAfee computer protections because everyone else had they but, rather, because I had wanted to have protected myself; as if that had been a bad thing.  Moreover, the said technician had gone on to have repeatedly stated to me that,' the PA had not been required to have provided me with Severance Pay'.  Additionally, within five (5) minutes of Ms. Hegarty's having approached my workstation and ordered me to have accompanied her into the Conference Room; as well as his having advised me, he had also advised me that the PA was going to have gotten rid of me.

14

38.   The PA had relentlessly subjected me to its retaliations and most dehumanizing harassments by its having removed, replaced, altered and /or deleted my work products; sometimes within minutes of my having filed them, and, then, badgered me and falsely accused me to have not performed them, not filed them, etc.  Nonetheless, however, I had in all but a relatively few instances secured the proofs (Screen Prints) confirming the exact times, dates and sizes of the work that I had actually performed and filed.  While, moreover, the previously said few instances I had not been able to have done so had been specifically due incidences and related harassments against me.

39.   There had been a couple of instances in which I mistakenly left my said Screen Prints in my printer while my having shortly stepped away to have gone to the Ladies Room and returned to have found them missing.

40.   The PA had subjected me to at will takeovers and denials of access to me by others of Contract documents having been, at those times worked on by me, while their having been opened and/or minimized on my Desktop; on a virtually every day basis.

41.   I was subjected by the PA to its at will takeovers and denials to me of access to my Desktop folders and documents created by me including my own personal password protected documents, such as, my Attendance log and detailed Contract Notes .

42.   Immediately upon my forced return to the PA's Contract Unit on June 23, 2008, following its wrongful Constructive Termination of my, then, more than sixteen (16) years tenure  with it by its FS Unit  on March 19, 2008, the PA had required me to have filed as well as created all of my work on a shared "M" Drive.  Yet, it had subjected me to very frequent denials of access to the said shared "M" drive.

43.   Under the guise of its having removed me from the hostile environment of its Contract Unit, the PA had relocated me to its Financial Services Unit (FS) in early August 2007, wherein I it had treated me with the upmost disrespect and contempt.  The PA had never intended to afford me any hostile work environment reliefs by virtue of its having relocated me from the extremely hostile work environment of its Contract Unit to that of its FS Unit.  To the contrary, the PA's such relocation had actually constituted, yet, enforcement upon me by it of an intentionally cruel and malicious retaliation for my having complained and pleaded to it for such relief.

44.   I had been a formerly trained as an Administrative Secretary as well as already acquired a minimum of fourteen (14) years related experience, most conservatively, as of  the time of my having become employed by the PA.  In retaliation for my having complained, nonetheless, immediately upon my relocation to the FS Unit, the PA had relegated and restricted me exclusively to racially disparate and contemptuous work.

45.   The PA had utilized its FS Unit relocation of me as means by which it had compelled me and held me fully, strictly and exclusively accountable to performing racially disparate work that had represented the tail-end work of the jobs belonging to everyone else in the FS Unit, that it had exclusively assigned to its Black employees.

46.    Up early January 2008, it had seated me one (1) isle over from the FS Unit that it had relocated me to in early August 2007, which I was supposed to have been a member as of that time.  In its having done so, the PA had assured that my FS Unit work environment would have been immediately retaliatory and wherein I was to have been relentlessly ostracized, dehumanized, discriminated against, unduly penalized, and that I would be made to have endured related pain and suffering, and otherwise subjected to racially disparate treatments.

47.    Further, the PA had required me to have lifted endless heavy folders containing invoices processed by all of my co-workers within the said FS Unit, scanned and filed them; on an alleged group computer that it had exclusively confined me to, and met a quota that it had initially set at two-thousand (2,000) per week.  Less than two (2) months later and following Ms. Zedeno's having endlessly praised and thanked me for the volume of invoices that I had up to that point scanned, nonetheless, the PA had falsely alleged the said scanning quota to be initially set by it at seven-thousand (7,000) per week in a related evaluation meeting.  Moreover, still, the PA had therein criticized me for my having allegedly not met the said, then, newly stipulated scanning quota as well as stipulated that I had been required to have done so from that point on.

48.    Additionally, the PA required me to have sort and boxed its FS Unit's mail along with that of Ms. Jane Hegarty and others on the floor, which had entailed hand-deliveries, and; moreover, that I had done so by 10:00 A.M, each morning.

49.    Further adding to its derogation and retaliation against me, the PA had confined me to an alleged group computer in its said FS Unit and not set up a personally assigned workstation for me or provided me with an alleged personally assigned computer until January of 2008, approximately five (5) months later.

50. That following month, on or about February 24, 2008 the PA had, then, violated my First Amendment Right to Free Speech by its having mandated me to have been seen by its Psychologist, Dr. Silva, for my having asserted my rights. Among other things, Dr. Silva had specifically advised me that the PA had not wanted me to assert my rights.

51. In a subsequent related visit, Dr. Silva had also advised me that I was to have not paid any attention to and was to have ignored any strange occurrences that I had noticed on my alleged personally assigned PA computer and/or related accounts. Moreover, Dr. Silva had stipulated to me, further, that her said advice to me to have predicated upon "no one having been complaining about the quality of my work.

52. The above said FS Unit position had been previously occupied a by Ms. Francis Lewis (Black). The PA had relocated Ms. Lewis from is FS Unit and placed her under the supervision of Ms. Demarest in its Contract Unit, where she had remained for approximately one (1) week or less. Further to which, Ms. Lewis had advised me that she had overheard Ms. Demarest having discussed her over the telephone and telling someone how she could not stand her; while Ms. Demarest had not been aware that she had arrived and was waiting to have spoken to on her very first day of assignment there.

53. While neither of us had known as of that time or even imagined that I would have ended up occupying her former position approximately six (6) months later, Ms. Lewis had, additionally; specifically, advised me that the PA had exclusively assigned it to Black employees whom it had wanted to have gotten rid of.

54.   While Ms. Zedeno (Cuban) had been my apparent Supervisor in the FS Unit, the PA had alleged Ms. Gleness Gordan (Black) to have been; particularly with respect to its wrongdoings against me.  In fact, Ms. Zedeno had conducted herself towards and treated me as though her she had been my Master and I a mere slave.  Furthermore, Zedeno had so relentlessly enforced her related such conditions and treatments upon me without any conscience, whatsoever, and; moreover acted as if she had obtained prior permission and/or instruction from the PA and been authorized to have done so.

55.   The FS Unit's management had initially treated very cordially.  In fact, I even had been advised by Ms. Gordon of the FS Unit's  having intended to have had small welcome gathering for me; which had been customary but never before afforded to me, that same week. Almost immediately afterwards, however, there had been a complete replacement of the above said cordiality with veiled hostility and contempt, while the said welcome gathering had never taken place nor even been mentioned, again

56.   Ms. Zedeno had upon my relocation to the FS Unit given me the option between two (2), then, available cubicles; one of which had been customarily cool and at that time set up as a mail center and the other of which had been located near the radiator.  Due to my intolerance of concentrated cold air because of my affliction with Scleroderma and the PA's longstanding past deliberate related harassments of me, I had chosen the said cubicle next to the radiator.

57.  Similarly, however, I had been advised by Ms. Zedeno shortly afterwards that my only other option had been limited to that of a cubicle that had been already occupied by a Ms. Iris Flores; a co-worker and apparent close friend and/or associate of hers; who had decided that she had wanted the cubicle that I had already selected.  Moreover, it had taken Ms. Flores until early January 2008 to relocate to the said cubicle next to the radiator and for the PA to have set up a personally assigned workstation for me in her old spot.  Nonetheless, the PA had restricted my access to my said personally assigned workstation to lunch hours and had, moreover, harassed and openly belittled and otherwise belittled for my having otherwise sat at it; directing and advising me that I was to have sat and exclusively scanned at the said alleged group computer..

58.  The PA's relocation of my from one (1) isle over from the FS Unit to that isle had occurred had immediately following Ms. Zedeno's having become aware and made a Federal Case of my having kept a typed log of my own work  and most aggressively, disdainfully and openly ordered me to have discontinued doing so.  My said Log had been hacked into corrupted immediately afterwards.

59.  As the result of Ms. Zedeno's having repeatedly demanded me to have discontinued the maintenance of my own said record based upon her having done so and, moreover, acted as though she had intended to have, literally, fought me, I had requested an immediate meeting with Ms. Hegarty in regards to it.

60. Ms. Zedeno's had followed me into Ms. Hegarty's, who had initially restated to me Ms. Zedeno's perspective; that I had not needed to have kept a record of my own work because Ms. Zedeno had been doing so. Following my having asserted to Ms. Hegarty that I had possessed the right to have done so, just as I had to Ms. Zedeno, however, she had very reluctantly advised Ms. Zedeno to permit me to have done so; while with telling glances having been exchanged between them, nonetheless.

61. Once the PA had set up my alleged personally assigned workstation, it had restricted my access to have sat there to lunch hours and required me to have otherwise exclusively sat at the said alleged group computer. The said group computer had been moved from its having been one (1) isle away from the FS Unit to the said mail center cubicle, simultaneous to the PA's having allegedly assigned me to Ms. Flore's prior workstation.

62. As means of preventing me from my having kept a record of my own work, the PA had, nonetheless; then, stripped the said group computer at which it had required me to have exclusively sat and worked of all of its Office Suite features including Word Pad, with the exception of Notepad.

63. Upon my June 23, 2008 forced return to the PA's said Contract Unit, its above and below described onslaughts of computerized and other terrorizations against me had been ever-more aggressive as well as sophisticated.

64.   This time around, the PA's Contract Unit had demanded of me that I had been fully compliant with its violations, abuses, and claimed to outright ownership of me.  It required me to have performed my work on a shared "M-Drive", to have compliantly permitted myself to be constantly harassed, berated and otherwise dehumanized based upon related alterations, replacements, deletions, removals of documents that I placed there as well on my Desktop, C-Drive and U-Drive.

65.   Moreover, the PA had some type of program placed on my alleged personally assigned PA computer or done something to it so that I could not Screen Print the first time that I tried; I had gotten get a blue circle, instead, but I had been able to have made the Screen Print the second time.  I had shared these things with the said Technician and believe that the PA had only as a result of my having done so become aware as to my having continued making Screen Prints subsequent to my said June 23, 2008 forced return to its Contract Unit.

66.   Although the PA Help Desk had specifically dispatched the said Technician for the repair of my computer, Ms. Hoppe and Ms. Demarest had approached my workstation shortly after his arrival and requested to have spoken to him in the Conference Room.  The Technician had, then, returned to my workstation approximately one-half ( ½ ) or more later and advised me that he was going to have made Ms. Denise Jones (Black) an Administrator on my alleged personally assigned PA computer.

67.  Ms. Jones had filled a vacated Senior Secretary position that previously held by a Ms. Barbara McNeil (white) and had not been as of that September 18, 2008 assigned by the PA it to its Contract Unit, even, a year, yet, or; to the best of my knowledge, employed by it, even, three (3) years.  Moreover, I had been required to train Ms. Jones in basic Calligo Contract preparation and management as well as very basic word processing skills.

68.  I had explained to the said Technician that, because of all of the above stated facts along with that of the PA's having uniquely denied and precluded me from my having received its agency-wide Novel User Account and McAfee protections, I had been denied any means of protection, whatsoever.

69.  Sometime in mid-2007, I had encountered difficulties while my having attempted to have opened my own, personal and password protected document in which I had made daily notations as to the exact details of all the work that I had performed on each contract.  Upon my having attempted to open my said password protected document, I had received a prompt advising me "the document is in use by Comanche".  My primary concerns in my having, then, contacted the PA's Help Desk had been those of: (a) my having gained access my own said very own personal and password document, and (b) my having made my related daily notations to my said document.  Moreover, I had not considered or imagined it possible and/or likely, even, that any else could or would have wanted to have gained access to my said password protected document and had, therefore, assumed my denial of access to it to have been merely attributable to some type of computer glitch.

70.  The PA's Help Desk had been at that time operated by the Unisys Support Team, which had generally been very highly skilled and a Mr. Cherney had remote had remote into my computer.  Mr. Cherney had been a truly exceptionally and among a number of highly skilled

having been at that time employed by Unisys, all of whom had generally identified as well as resolved related problems very quickly. Nonetheless, it had taken Mr. Cherney approximately three and one-half hours (3 ½) to have done so on this occasion. By virtue of Mr. Cherney having remote into my computer as well as his having explained, I had been privy to virtually every move that he had made during that time as well as the difficulties and apparent counteractions of his moves that had appeared to me to have been taking place.

71. Once finished, Mr. Cherney had advised me that he had given me back control over my "My Documents" folder/alleged personally assigned computer following someone with Administrative privileges having taken it over, which he had advised me; further, had been a Federal Crime. Mr. Cherney had gone on to his having advised me that he had documented and would email me confirmation of a detailed report of the countless steps that he had been required to have taken in order for him to have given me back such control.

72. Additionally, Mr. Cherney had advised me that he had escalated the matter and had been certain that a high-level individual from the PA's Information Technology Department was to have contacted me because, as he had stated to me; further, and apparently sincerely believed as I had, that the PA had taken matters such as those very seriously. The very next day I had been faced with the exact same issue and had, shortly afterwards, also begun experiencing related hackings, replacements deletions, lockouts, etc., having been taken place respective of my alleged PA assigned Outlook and other account.

73. I had shortly afterwards discovered that more than one (1) Outlook account had been assigned under my User Name, only one of which I had been granted access to at any given time. Additionally, others PA staff had been permitted to have instantaneously controlled and determined which email account and Outlook Account I was to have been granted access to,

when I was to have been permitted access to it and/or if at all. Shortly prior to my having made

such discovery I had experienced instantaneous disappearances of every single email that had

been sent to me by a particular individual l along with a new Outlook folder that I had in their

name; solely created having clicked that folder to open it.

74.    I had named the said folder Teri, after my, then, immediate Supervisor; Ms.

Demarest (Black) and intended to have copied as well as filed the countless harassing emails that

she had sent me daily into but wanted to have opened it, first.

75.    The PA's said wrongful and deliberately malicious September 18, 2008 action

against me had been enforced upon me by Ms. Jane Hegarty, who Ms. Demarest had been

employed by the PA as an Assistant and promoted to the Contract Unit as my immediate

Supervisor by.  Moreover, aside from Ms. Hegarty's having been unrelenting in her inflictions

upon me of such actions, she had also been an Engineer of Project in the PA's TB&T  Unit at the

time of my said early August 2003 relocation there and late December 1995 wrongful and

racially motivated termination from it.

76.    The PA had with deliberate and intentional malice relentlessly harassed, retaliated

against me, and violated me by its having contaminated all aspects of my work experience with it

and assured the hostility of my work environment.  This had included but not been limited to its

having relentlessly subjected me to its replacements, deletions and alterations of emails as well

as permitted others of its employees to access its alleged personally assigned to me computer

accounts as me.

77.    In retaliations for my having discovered, complained about and attempted to have

protected myself against the very substantial computer hackings to I was being maliciously

subjected by the PA, it had uniquely and specifically precluded me from my having made any

direct contact with its Help Desk for any computer related problems. Further to which, the PA directed me to have, instead, addressed all such computer-related issues with my immediate Supervisor(s); whom had not been hired nor at those times employed by the it in any related technical capacities, which had been in violations of its own related written computer policies.

78.    Adding injury to insult and in, still, further retaliation, the PA had also falsely accredited my finished work products to others and engaged in, literal, related alterations and falsification of its Contract records and, then, retaliated against me for my having discovered in early August 2907 as well as complained to about it. Within minutes of my arrival at work that following morning, Ms. Jane Hegarty of the PA had summoned me to her office in another building and hostilely advised and threatened me that I would severely punished in the event that I had ever, again, investigated my own said finished work products.

79.    The PA had throughout my approximately seventeen and one-half (17 ½) years tenure with it required and utilized me to have performed the overwhelming majority of the clerical workloads within the various Units its Engineering Department, wherein it had exclusively maintained and restricted to.

80.    My Return to Duty with the PA following its said wrongful and racially motivated late December 1995 termination of my employment with it had resulted from related legal action that had been taken against me by CWA Local 1032 (CWA). In light of CWA's longstanding mistreatment of me and collusion, conspiracy and complicity with the PA against me, I am certain that it had only offered me re-employment based upon its having included me as part of a very large loss of its membership, which had constituted a significant blow to its finances. There is no doubt in my mind, whatsoever, that CWA would never have, otherwise, sought any justice

on my behalf were the PA to have limited its exact same actions against me to just me. CWA had never, throughout the entirety of my approximate seventeen and one-half (17 ½ ) years tenure with the PA, ever arbitrated on my behalf.

81.  The PA's said racially motivated late December 1995 termination of my employment with it was deemed to have been legally wrongful based on Seniority.  My length of employment with the PA as well as with its TB&T Unit, where I had been located at the time of its such action(s) against me, had been longer than that of Ms. Gina Marie Doyle (white); who had been assigned to that Unit in 1995. Yet, Ms. Doyle had been at that time retained by the PA, while it had terminated my employment with it.

82.  Furthermore, while I had already achieved a minimum of  fourteen (14) years Secretary experience as of my February 10, 1992 date of hire by the PA; very conservatively, Ms. Doyle had only achieved six (6) months prior Temp experience as a Secretary with the PA as of the time of her having been hired by it approximately one year earlier.  This is as per Ms. Doyle's own EBT in my prior case in this matter, (See *97-CV-2477*).

83.  Nonetheless, however, the PA had required me to have trained Ms. Doyle and made me subservient her while it's having assigned me virtually the entire Unit's typing, simultaneously, and to have e-mailed her all of my finished work products.  In fact, the PA had enforced the same racially motivated denials of equal and fair payment and treatments upon me respect of all other similarly situated white Secretaries to whom it had made me subservient, over the course of my longstanding tenure with it.

84.  Ms. Doyle had personally advised me that she had been on her very first day in the TB&T Unit authorized to have earned unlimited Comp time and worked overtime at her own discretion as well as made up for any lateness by Mr. Peter Rinaldi, but that I could not because

they had been out to have gotten me. Moreover, while I have never know who "they" were, the exact same warnings and threats had been issued to me by virtually every PA Representative present at the said August 2003 meeting by which I had been transferred to its TB&T Unit as well as CWA.

85.  Furthermore, Ms. Doyle had confirmed the PA's such racially disparate common practices; which it had practiced and maintained and throughout my entire said longstanding tenure with it, in her related open Court testimony in my prior case in this matter see, (See 97-CV-2477) .

86.  In stark contradictions, however, I had been immediately upon my relocation to the PA's TB&T Unit advised that there had been no monies available in its budget for me to have worked any Overtime or earned any Comp time, whatsoever, and that I had been strictly precluded from my having done so. Moreover, the PA had docked my pay for as little of two (2) minutes lateness. Such advices had been issued to me in the very meeting by which the PA a relocated me there and repeatedly asserted to me by Mr. Rinaldi, all two (2) of the three EOPs in that Unit, CWA and virtually everyone else having been present.

87.  While there are no words with which I am able to convey the depths of pain, hardship, and suffering that I had been made to have bore owed to the PA's relentless impositions upon me of its clear and blatantly racist such treatments and working conditions, I had never blamed nor taken it out on Ms. Doyle. Furthermore, Ms. Doyle had from the very first day of her assignment to the PA's said TB&T Unit also advised me that she had been made responsible for the monitoring and micromanagement of my attendance but had stipulated; further,  that she had not gotten paid enough to have gotten involved. At first, Ms. Doyle had

thanked me endlessly on a daily basis for my having trained and otherwise helped her but that had not lasted very long. Ultimately, she had spoken to and treated me with the upmost disrespect.

88.   Nonetheless, however, I had was shocked by Ms. Doyle's truthful testimony in my said prior related cased in this matter as I am certain the PA had been also. The fact that Ms. Doyle had done so speak volumes to me as to her true character, particularly given that the PA is most vindictive, revels and commands in frauds that are well protected by most powerful blue walls of avocation; as opposed to silence.

89.   In late December 1995, the PA had subjected me to a prior termination of my employment with it under the guise of my position with it having at that time having been abolished due to its Reduction in Force, which had been; in fact, wrongful, racially motivated and retaliatory.

90.   The PA had singled me out as my having been at that time the only Black assigned to its TB&T Unit, where it had assigned me. Contrary its false and clearly contradictory verbal and written advices to me as well to the EEO Commission alleging its December 1995 action(s) against me to have resulted from its abolishment of my position, the PA had, in fact, immediately filled it with a Ms. Kathleen Foley (white); (See *97-CV-2477*).

91.   Prior to my having at that time sought the EEO Commission's assistance, protection, and reliefs from the PA's systemically racist employment practices to no avail, I had made countless futile pleas for related assistances, protections and reliefs to the various related offices within its own establishment; including its in-house EEOC Office. Rather than its having

afforded me any of the assistances, protections and reliefs that I had most desperately sought after and appealed to it for, however, it had; instead, relentlessly subjected me to related immediate retaliations.

92.    The PA maintained me on a more than three (3) year continuous probation from my time of hire by it, from February 10, 1992 to late October 1995.  Moreover, it had terminated its said enforcement upon me in late October 1995, just shortly prior to its having subjected me to its said late December 1995 wrongful and purely racially motivated termination of my employment with it.

93.    The PA had taken me off the said extremely extended and unlawful probation that had been facilitated as well as effectuated by Defendant CWA by sole means of its having blackmail me.  The PA had propositioned/blackmailed me with the offer of its having done so providing, only, that I had agreed to have accepted and been deemed by it to have successfully performed the duties of a, then, vacated Senior Secretary position; until such time as it had selected a candidate for it,  simultaneous to those of my own C-15 Secretary position.  The said propositions/blackmail had been individually put forth to me by Ms. Andrea Giorgi-Bocker (EOP), the late  Mr. Louis Miller (EOP), and Mr. Peter Rinaldi (Manager) of  the PA's TB&T Unit.

94.    Furthermore, the PA had, then, cited its continued maintenance of me on its said the previously mentioned, more than three (3) year continuous probation status as having been the basis and pretext upon which it had precluded me from and denied me any and all opportunity to have applied for the above said Senior Secretary position.

95.    Aside from the fact of my having  as of the time of the PA's 1992 hiring of me already, long since, achieved levels of related qualifications and skills that had far surpassed

those that had been functional requirements of its said Senior Secretary position, the PA had; additionally, required me to have subsequently trained its selected candidate for that position.

96.    Throughout my entire approximate seventeen and one-half (17 ½) years with the PA, it had only performed two (2) other; nearly back-to-back, evaluations of me between early August 2007 and March 19, 2008, aside from the above described ones that it had performed in connection with its having blackmailed me.

97.    The PA had performed the above said two (2) evaluations of me in conjunction with a retaliatory position that it had relocated me to in its Financial Services Unit (FS) in early August 2007, under the guise of its having removed me from the hostile environment of its Contract Unit.

98.    I had been formerly trained Secretary, who had been already substantially skilled and experienced as of the time of my having been hired by the PA as well as my having possessed approximately thirty-three (33) or more years related experience as of the of the time of the PA's said early August 2007 relocation of me to its FS Unit. Yet, again, while under the pretext of its having removed me from the extremely hostile work environment of its Contract Unit, it had; instead, reduced, restricted and relegated me exclusively to my having been required to have lifted heavy files containing invoices processed by co-workers in the FS Unit and scanned as well as filed them. I had also been required to have sort and box the FS Unit's mail, daily, and make related hand delivered to Ms. Hegarty and sort and box that groups mail others.

99.    Moreover, the PA's above said early August 2007 to March 19, 2008 evaluations of me had been performed on the sole bases of the scanning related quota(s) that it had originally set and almost immediately thereafter subsequently raised; while CWA had been in no way available to me.

100. With the exceptions of my relatively brief assignments and/or administrations under Mr. George Hogan, Mr. Jerry Dinkins, Ms. Gladys Jimenez, and Ms. Louise Burke, the PA had for my entire tenure with it required me to have taken direction from virtually all of its white employees and permitted them to directly assign me work.

101. The PA own Human Resources Department had confirmed the PA's such relentless and racially biased treatments of me, via its open Court testimony in my prior (97-CV-2477) case in this matter. It had attested that the PA's had never imposed upon any of its similarly situated white employees, whom had possessed considerably worst Sick records than I, the related harassments, penalties and disparate treatments that it had relentlessly enforced against me.

**Denials of Fair and Equal Treatment and Pay**

102. Ms. Gina Doyle, a former co-worker, who had possessed exceedingly lesser skills and experienced similarly situated white co-work and I had been required by the PA to have trained and made subservient in its TB&T Unit had also therein testified in the above referenced matter to the fact of its having extended to her racially biased preferential treatments.

103. I was made subservient by the PA to Ms. Mary Lou Rivera (Greek) and assigned work by her as well as individually by the Unit's PMs and EEOPs, including non-work related work items; upon its August 1993 relocation of to its TB&T and immediately made subject to racially biased and racially exclusive constraints and abuses.

104. I had been, at least, as equally skilled and experienced; if not more so, as had Ms. Rivera. However, unlike the below stipulated similarly situated white employees to whom the PA had subsequently subjugated me to, however, Mr. Rivera had taken pride in her own work

32

and had not pawned, literally, nearly one-hundred percent (100%) of it upon me as they had been permitted to have.

105.  In another such instance  while, still, in its TB&T Unit, the PA had, then; subsequently required me to have trained and made me subservient to a Ms. Barbara Schmitt, who had allegedly suffered from some type of mental deficiency.  Ms. Schmitt had been so lesser skilled, in fact, that she had routinely been unable to locate her own computerized filings.

106.  In one instances, Ms. Schmitt had gone AWOL for a significant period,   without her having telephoned the PA and left a voicemail until the wee-hours of the fourth (4th) day.  Further evidencing its longstanding, preferential and racially biased privileges afforded by the PA to its similarly situated white employees, I had witnessed the PA's Time Keeper alter her related attendance records, so as to have assured her related consequences.

107.  In fact, a Mr. Mohammad Mohib, who had been a; then, Engineer of Projects (EOP) with the TB&T Unit had because of this repeatedly and openly advised the PMs to have given their work to me if they had wanted it done properly.

108.  Moreover, I had been openly reprimanded as well as written up by the TB&T Unit Manager,  Mr. Peter Rinaldi, because Ms. Schmitt had been unable to have located and falsely accused me of my having never emailed to her a particular one (1) of my finished work products; which I had done, in fact, on, at least, three (3) separate occasions.

109.  Furthermore, the PA had required me to email my finished work products to all of the similarly situated white Senior Secretary to whom it had made me subservient.

110.  The PA had in its World Trade Department, then, subjugated me to a Ms. Eileen Demolewski, over who I had clearly possessed some degree of discernable greater Secretary Skill and experience.

111. The PA had for the entirety of my said approximate seventeen and one-half (17 ½) years tenure with it consistently utilized as means of its having precluded me from and denied me the right to have ever applied for any other position including lateral ones, against me it's said previously stipulated blatantly racist practices.  Furthermore, such treatment of me by the PA had been consistently supported as well as excused by CWA.

112. Still in its World Trade Department, the PA had filled its Unit's Senior Secretary position with a Consultant staff member, a Ms. Dawn Montella, who it had made permanent.

113.  Ms. Montella had at the time her such placement by the PA boasted to me and others as to her having not possessed any prior Secretary experience, as she had perceived such work to have been beneath her, been beneath her.

114.  Additionally, Ms. Montella had also taken and failed to have passed the PA's Basic Skills test as of the time of her said placement by the PA, to the best of my knowledge.  Therefore, I had possessed approximately twenty-eight (28) years related experiences over.

115.  Nonetheless, however, the PA's had precluded and denied me any and all opportunity to have, even, applied to the above said Senior Secretary position by means of its having utilized against me a known to it chronic and ADA protected illness and denied me the related accommodations that I had been entitled to.  This had also been condoned and fully supported by CWA, which had not afforded me any protections, whatsoever.

116.  All of my related complaints to CWA, if I had been permitted any access to it and/or it had entertained them at all, had resulted in its having condoned as well as excused the PA's such blatant and systemically racist treatment of me.  It had attributed them to the PA's Job descriptions having allegedly been at will.

34

117. Moreover, this had been in total disregard of the fact that the PA had very heavily and repeatedly solicited to me and assured me of a very specific position with its Engineering Department after my having declined to have, even, interviewed for it. I had elected to instead, wait for a position to have become available with its Law Department.

118. The PA had at no time, ever mentioned nor had I at time known of nor accepted an at will position with it.

119. The collusion and conspiracy that had for the entirety of my said tenure with the PA existed between it and CWA are made apparent, among other things, by the fact CWA's position statement to Equal Employment Opportunity Commission (EEO C) consisted of the PA's below described alleged and wholly falsified and fabricated charges against me; ; almost in its entirety. With further regard to CWA's said Position Statement, it had also acted in an illegal manner against me by its having falsely alleged therein that I had signed a Waiver of My Rights.

120. The above said charges had been issued to me by the PA via Express Mail approximately one (1) after its having already acted as Judge, Jury and Executioner subjected me to its said September 18, 2008 Action against me.

121. Moreover, still, CWA had at no time ever investigated, questioned, discussed with me or, even, cared about the validity of the Charges. CWA had been, itself, knowingly and deliberately complicit in as well as conspired and colluded against me with the PA in its September 18, 2008, March 19, 2008 to June 21, 2008; along with countless other of its related such wrongful actions against me, covering the entire period of my said tenure with the PA.

122. To which end, the PA's said wholly fabricated and falsified Charges against me had been mutually designed and intended to have been utilized by CWA and the PA in order to have concealed their mutual and deliberately malicious wrongdoings against me as stipulated on the

pages below. Many of the falsehoods represented by the said after-the-fact wholly fabricated and falsified charges are, in fact, clearly discernable and demonstrated by the repetitions of them as well contradictions between them and their alleged substantiated documents.

123. CWA had conspired and colluded with the PA against me by and conducted itself in an otherwise illegal and improper manner against me. It had repeatedly permitted the PA to utilize against me documents that had been known by it to be long since time-barred by its own related written policies and procedures along with other such documents that had been know and demonstrated to it and the PA to be whole fabrications. In its having done so, it had acted illegally, improperly and against my best interest.

124. CWA had not only been guilty of its having denied and refused me the rights and protections to which I had been entitled under its Contract but also of its having engaged in illegal and corrupt conducts against me. It had deliberately denied and refused me any due process and/or the related protections to which I had been entitled by it against the PA's said wrongful and deliberately malicious September 18, 2008 action against me as well signed the related document as its having been a Witness against me at the PA's direction.

125. Moreover, CWA had sought to coerce me into my having waived all of my rights in this as well as forfeited all of my due Severance Pay, justice and all related recourses, and sealed my own fate. It me to have made a minimum deposit of $7,500.00 in order for me to have represented myself or been represented by anyone other than it, respective of the unjust action(s) that it and the PA had already acted complicit in and enforced upon me as Judge, Jury and Executioner.

126. CWA had deliberately failed, denied and refused me my right to have been afforded its own contract stipulated right to a perquisite Hearing. It has to this date denied me my

contract stipulated Net Severance Pay in excess of $16,000, which it tried to have manipulated me into my having accepted a gross reduction of, and, then, further penalized and burdened me for my having not assisted it and the PA in covering their mutually complicit wrongdoings against me.

127.  Further acting in illegal opposition to me , CWA had set me up in mid-April 2008 on behalf of the PA in attempt to also covered the PA's March 19, 2008 Constructive Termination against, while its having false advised me that it had intended to have arbitrated on my behalf, instead.

128.  CWA had on or about April 23, 2008 deliberately mislead me and set me up on behalf of the PA by its having uniquely telephoned me and, specifically and falsely advised me that the PA was going to have Returned me to Duty that following Monday without its having required me to have been, first, seen by its Psychologist.  It had further advised me that I was my Return to Duty by the PA because its Law Department had allegedly advised it that it had been illegal for it to require me to have performed the type work that it had.

129.  Instead, however, the PA had advised me on date that I would be written up and placed on Administrative Disposition, unless I had agreed to be seen by the PA's Psychologist.

130.  Additionally, CWA had engaged in and been a party to the falsification of alleged official testimonies and legal documents against me as well by me pertaining.  It, the PA and others have colluded and conspired to have falsely depicted and legally filed as having legitimately taken place and my having been a party an October 24, 2008 after-the-fact Hearing that had not taken place and I had not been a party to, in fact.

131.  CWA had had not had any contact with me since late August of 2007 and Mr. Faulkner of Councilman Barron's Office had been supposedly representing me since April of

2008 and up to October 24, 2008  at which time he had completely abandoned and betrayed me. Yet, it attributed to me false testimony in regards to its EEO C Position Paper.  Moreover, I believe the EEO C to have been a party to CWA's such false testimony attributions to me since they parrot my original June 2008 unacknowledged and never returned original Complaint to it. CWA's such false testimony attributions to me had been almost verbatim to my said initial June 2008 EEO C Complaint, in fact.

132.  Throughout and up to the time of PA's said 1995 termination of my employment with it, I had sought and most desperately pleaded for reliefs and protections me from the PA's own internal EEOC Office, Human Resources Department, Executive Offices, Defendant CWA, and the Equal Opportunity Commission ; itself.  (See *97-CV-2477*)

133.  I had been very heavily solicited the position as sole Secretary to a Project Manager (PM), Mr. Michael Valletta in the PA's Engineering Department.  Based solely upon the persistent related solicitations made to me by a Ms. Dottie Epstein and Ms. Patti Miller of the PA's Human Resources Department, I had eventually agreed to have interviewed for and ultimately accepted it. The said persistent and repeated solicitations had been made to me following my having already declined to have, even, interviewed for the said position.

134.  The PA had interviewed me on three (3) separate occasions.  I had been interview by Ms. Epstein and Ms. Miller Separately and Mr. Anthony G. Cracchiolo, Mr. John Shell and Mr. Enoch Lipson, collectively.  The PA's said Interviewers had harped on the alleged benefits of the said sole Secretary position and allege related opportunity it had been offering me to have worked for it; most particularly.  My most aggressive solicitors had been Ms. Miller and Mr. Cracchiolo.

135.  The said PA Representatives had gone on and on about a half-hour grace period that the PA had allegedly afforded to all of its Clericals, which, it had , in fact, afforded to me throughout the overwhelming majority of my officially scheduled one (1) year probation period. Subsequently, however, it had,  then; utilized it to have falsely depicted me as my having, exhibited an alleged attendance problem; instead, and as one of many of the mechanism by which it was to have commenced and for the entirety of my tenure with it made seemingly justifiable its enforcements of racially motivated abuses and violations of me.

136.  Another of the PA's said Represents' subsequently proven to have been treacherous and/or wholly false heavy solicitations to me had been that of its having supposedly provided its Clericals with bi-yearly raises and promotions.

137.  In fact, it had illegally maintained me on a more three (3) year continuous probation from its February 10, 1992 date of hire of me until late October 1995, throughout which time it had denied me any opportunity to ever apply for any other positions including lateral ones on that alleged basis.  Further to which, Defendant CWA had during this time withheld all of my related Union mandated increases from the above stipulated date of hiring by the PA up to my late October 1997 Return to Duty with it from its prior December 1995 wrongful termination of me.

138.  The solicitations that the PA's said Representative's had made to me as to the said sole Secretary position having offered me unlimited Overtime and Comp time had been, in fact, proven to have been true.  I have always been the type of employee who willing to go the extra mile, if needed; especially for a good boss/person, I had not particularly perceived such solicitation as its having been an opportunity.  My related preference and expectation had always been those of my having been able to perform my assigned responsibilities as well as earn an

equitable base salary within my actual workday, rather than my being dependent upon overtime to make ends meet or fulfill the obligations of my base duties .

139.  The PA had permitted me to have been individually assigned work by countless other PMs, whom had been at that time located on the 73rd Floor of the former One World trade center; in additional to the work that had been assigned to me by for Mr. Valletta, for who I had been hired by the PA, and an upwards of fifty (50) other Professionals whom had been housed on the 74th Floor of the former WTC with us.

140.  As a result, I had been oftentimes required by the PA to have worked up to 9:00 p.m. to 10:00 p.m., while my having never been afforded nor made aware of its related Car and Meal Services until it such time as I had been advised as to its having been discontinued it.

141.  Given this, in conjunction with the PA's said related false and retroactive depictions of me as my having exhibited an attendance problem during this period, in retrospect, the PA had by no means been worth that said extra mile.

142.  The PA had for the entire balance of my said longstanding tenure with it denied me any and all opportunities to have worked and earned any overtime or comp time, whatsoever, with the exception of my original slated twelve (12) month probation period with the it.  This had been in clear violations of CWA's related contract stipulations but, nonetheless, fully supported and overlooked by it.

143.  The PA's said Representatives had in their solicitations to me, moreover, repeatedly assured me that I was to have been exclusively assigned to the Mr. Valletta and performed my, then, longstanding and customary work.  Just weeks prior to my said scheduled one (1) probation period ending, however the PA compelled me into a position by which and whereby it was to have for the entire length of my said approximate seventeen and one-half (17 ½ ) years tenure

40

with it, then, subjugated me to lesser skilled and experienced; similarly situated white employees. It had commenced its doing so by is having <u>only</u> pretended that it had compelled me into such a position under a similarly situated Black employee, for just the initial few weeks.

144. Throughout the entirety of my said tenure with the PA, CWA had precluded me from my having been able to have, even, complained to it about my having been racially subjugated. It had done so, most largely, by its having completely denied me any access to it, whatsoever; let alone afforded me the opportunity to have, even, addressed the issue(s) with it.

145. CWA had, moreover, condoned and supported the PA's such gross mistreatment of me by its having consistently alleged that the PA had possessed the right to have done so based upon its Job Descriptions having allegedly been at will, in those relatively few instances in which it had permitted me contact with it. In contrast stark, however, the PA nor CWA had ever required or permitted similarly situated white employees and members to have been made subservient to similarly situated Black its employees.

146. From the time of my February 10, 1992 hiring by the PA up to just weeks prior to the scheduled ending of my original one (1) year probation period; February 10, 1993, I had been stationed by the PA on the 74th Floor of the former WTC; along with an upwards of fifty (50) Professionals. I had been specifically assigned to Mr. Valletta but served as sole Secretary to the entire 74th Floor.

147. I had been required to have provided telephone coverage on the 73rd Floor to Ms. Williams (Black), Mr. Cracchiolo's Secretary, during her breaks, lunch hour and from 4:00 P.M. to 5:00 P.M. Ms. Williams had been located on the 73rd Floor of the former World Trade Center along with an upwards of 200 professional staff and two (2) Time Keepers.

148.  The said PA said primarily white professional staff member on the 73rd floor had subjected me to constant disrespect, harassments, and otherwise racially biased treatments to which the PA's similarly situated white employees had not been subjected.  The PA had permitted all of them to have directly me work as well as acted as my Supervisors.  To which end, each of them had demanded of me that I had set aside work that I had been specifically assigned and directed to have performed by Mr. Valletta, during the relatively brief periods that I had provided telephone coverage to their floor, in order to have; instead, prioritized their work.

149.  My work assignments nor the quality of my work had ever been evaluated by the PA and the said excess of 200 PMs nor anyone else at the PA had known or cared about what other work I was being assigned.  They had only cared about their own work assignments to me and, again, each demanded that I their said assignments be prioritized over everyone else's.  Given that this had been an absolute impossibility for anyone, I had been required to work excessive overtime and until late at night in order to have done so.

150.  Even so, my efforts had not at all been appreciated and I had been made subject to constant threats of my having been reported to Mr. Cracchiolo for my having not completely them on the spot and had been, in fact, reported to him.  I was regarded and treated as a Slave by them, as if had no right to have refused them, simply because they had been white and I Black, and not a Human Being.  No one considered or cared about the actual infeasibility or multitude of the demands that were being made upon me and the predicament I had been unduly place in.

151.  I had possessed a very good rapport and work relationship with Mr. Valletta and regularly apprised him as to any run-ins that I had encountered with the above said upwards of two-Hundred (200) Professionals.  Mr. Valletta would tell me not to have worried about and that would smooth things over.  Moreover, he had assured me that I such treatments of me would end

42

once the PA had taken me off probation.  I had been taken off probation by the PA.  So as not to have unduly bothered Mr. Valletta,  I had never apprised him of the similar mistreatments to which I had been routinely subjected by the PA's Clerical staff during such times.

152.  Immediately upon my having learned of the immediately impending relocation of our group from the 74th to the 73rd Floor of the former World Trade Center, I had expressed my related trepidations because of the previously described circumstance to Mr. Valletta.  In response, Mr. Valletta advised me that I had done well and that he had been certain that the PA was to have made me permanent.

153.  Mr. Valletta had worked very closely with the Chief Engineer of the PA's Engineering Department on a numerous big projects.  As a result, Mr. Cracchiolo had in response to the said PM's related complaints against me, generally directed me to continue working on Mr. Valletta's assignments to me.  Nonetheless, Mr. Cracchiolo had permitted as well as supported the said PM's having immediately upon my having been relocated from the 74th to 73rd Floor of the WTC in late December 1992 begun to have exacted their revenges against me in full and unchecked.

154.  I had been for all but a less than one and one-half (1 ½) months of my said scheduled one year probation period, February 10, 1992 to February 10, 1993,  immediately stationed with and supervised by Mr. Valletta.  Nonetheless, Mr. Cracchiolo had almost immediately upon my said relocation, unilaterally, extended my said slated original one (1) year probation period. He had done so by his having issued me a memo on February 24, 1993, in which he had stipulated that; although Mr. Valletta had classified my work performance as having been somewhat satisfactory, he had not personally had an opportunity to have evaluated me and moreover, had possessed some unspecified questions as to my ethics.

155. Mr. Cracchiolo had in his second such extension of my said scheduled one (1) year probation period, three (3) months later and given me the option to have signed it or otherwise have been terminated, Mr. Chracchiolo had alleged my performance to have been unsatisfactory

156. The above said February 24 2003 commencement of the PA's first original extension of my said slated original one (1) probation period, two (2) weeks subsequent to its scheduled expiration; had been almost completely covered by significant incidents that had been beyond my control.

157. I had been, in fact, completely out of work for six (6) weeks of it; due to my having never received any contact from and been unable to have made any contact with anyone at the PA following the February 26, 2003 bombing for the former WTC.

158. Moreover, the PA had temporarily relocated us to the former Five WTC Alexander's building following the above said bombing and had relegated me exclusively to making hand deliveries; on crutches, throughout our entire stay there. I was under orders of the specialists to whom the PA's Medical Department had referred me to have kept my foot and required by the PA's related policies to have complied with them as well as restricted from my having traveled in wet weather.

159. Nonetheless, I was required by the PA to have made such had deliveries while on crutches allegedly because there had only been one computer available as well as made to have sat its TB&T Unit, instead of my own group, allegedly because I had left my coffee on the desk too long.

160. In response to my having pointed these facts out to Mr. Cracchiolo and, moreover, there had not existed a basis upon which he could have evaluated me. Mr. Cracchiolo had, then, that I had allegedly left a message for him on his Secretary's desk when the PA had first employ

me in early February of 1992, that he had received unspecified complaints about my work performance from unidentified staff members and that I had allegedly and retroactively exhibited attendance problems.  Moreover, Mr. Cracchiolo had alleged subjected me to such character defamation and assignation on those bases.

161.  Additionally, Ms. Williams' desk had been located on the other side of Mr. Cacchiolo's cubicle while, moreover, the such attendance problem depiction had been wholly manufactured in connections with the previously mentioned half-hour grace period that PA had heavily solicited and boasted of to me of its having allegedly afforded to all of its clericals.

162.  I had made numerous telephone calls and sent detailed faxes to CWA Headquarters and attention of its President as well as, Engineering Department Representative, Ms. Karen Zapansky; in most desperate pleas for assistance and no one ever responded.

163.  In fact, CWA had denied me any and all contact with it, whatsoever, until such time as it had made the PA August 2003 third (3rd) extension of my sail slated original one (1) year probation period and simultaneous transfer of me to its TB&T Unit.

164.  Rather than its having at that time arbitrated on my behalf, CWA had betrayed me, denied me the related rights and protections to which I had been entitled as well as, itself, acted against my best interest and deliberately ill advised me.  Moreover, it had effectuated and advised me that I had no option other than to have accepted an addition six (6) month extended probation period; having at that point constituted a continuous two (2) year probation from the February 10, 1992 date of the PA's having hired me, or be terminated by the PA.

165.  Mr. William Taville, the, then, Chairman of the PA's own in-house EEOC Office, had subsequently advised me that CWA's such advice to me had been untrue and that; moreover, I should never have signed the memo by which it had been effectuated.

166.  CWA had completely isolated and abandoned me by its having denied me any and all contact with it immediately subsequent to its having made the PA's excessive probation against me up September 1997.  CWA had at that time sent me a letter offering me Return to Duty with the PA following its said prior late December 1995 wrongful and racially motivation termination of my employment with it.

167.  The PA had similarly subjected a large group of CWA's members to wrongful terminations, which had significantly impacts upon its membership dues and financial bottom-line; I just happened to have been a part of that group while CWA had, moreover, taken is share of my related back pay without hesitation.  There are no doubts in my mind, whatsoever, that CWA would never have arbitrated or otherwise taken legal action on just my, even if the same exist wrong had been perpetrated against me.

168.  The PA had immediately upon my relocation the 73rd floor of the former One WTC separated me from Mr. Valletta, without its having given me any advance notice, whatsoever, and stationed me immediately next to Ms. Williams and just outside of Mr. Cracchiolo's cubicle. Moreover, it had immediately subjected to me relentless dehumanization, badgering, harassment and other racially disparate treatments by her, which she would not have been permitted by it to e enforce upon any of its white employees.

169.  Ms. Williams had been as of that time possessed clearly identifiable less skill and experience than I as a Secretary and very inconsistent in her own formatting.   Nonetheless, however, she had given me contradictory directions; as to the PA's, alleged proper policies and procedures.  Moreover, she had otherwise constantly subjected me to harassment and most painful dehumanization.

170.   She had openly badgered, humiliated, berated, and belittled me for my having signed in for my scheduled time of arrival, only to, then, equally abused me for my having adhered to her such direction and signed in for my actual time of arrival that following day.  In other instances, she had directed me to have let her know whenever I was going to have stepped away from my desk, only to have humiliated and dehumanized for my having let anyone know that I had been going to the Ladies Room.  She had subsequently and in most derogative manners advised me, advised me that I had not been a child; as if I had not known this, and that, moreover, no one need to have known that I had been going to the bathroom.

171.   Having been unable to withstand it anymore, I had requested a meeting with Mr. Cracchiolo.  In that meeting, Mr. Cracchiolo immediately yelled at me, literally; as if he had been speaking to an animal, and falsely asserted to me that I had been specifically hired by the PA as a backup to Ms. Williams.  Moreover, he had asserted to me moreover, that I had been deemed by it to have been unsuccessful in my probation period due to my alleged failure to have fulfilled that role and had, additionally, attributed Ms. Williams' such treatment of me to that lie.

172.   There are no words, whatsoever, with which to describe the immense pain, injury and sense of degradation I experienced by this.  In fact, as clearly as if I were being so disdainfully, openly and falsely accused at this moment, my eyes have involuntarily filled up with tears.

173.   The PA had wholly fabricated the above-said pretext of 'back-up' position just weeks prior to the February 10, 1993 date upon which my original one (1) year probation period with it had been slated to have ended; which it would never have sought to have enforced upon an, even, an unskilled similarly white employee.

174. Nonetheless, however, it seems fairly obvious to me that Defendant CWA had clearly expected as well as demanded me to have acquiesced to the PA said, on-the-spot, wholly fabricated position as having represented the true facts. It had demonstrated this to me by its having subjected me to its complete and total and abandonment as well as denied me and all of the rights and protections to which I had been entitled to under its contract, while its having; nonetheless, continually deducted its dues.

175. Mr. Cracchiolo had subsequently proven his such open and most painful and personally damaging and hurtful assertions to have been wholly false. He had given contradictory EBT Testimony in my prior Civil Lawsuit against the PA in this matter and therein attested to the true facts. See *97-CV-2477)*.

176. CWA had also been name in my said prior Law Suit but had been, somehow; mysteriously omitted from my Claim by the EEO C. I had I clearly stipulated it as well as detailed the manners in which CWA had been complicit in the PA's acts of racism and aggression against me to the Representative who had typed it up and, personally witnessed its having been included on the Original Complaint Form that I had signed.

177. Even so, the PA had falsely alleged to me verbally as well as it writing that its said 1995 wrongful and racially motivated termination of my employment due its having abolished my position based upon a Reduction in Force. While, moreover, it had provided clearly contradictory related such pretexts to the Equal Opportunity Employment Commission (EEO Commission) that had been falsely by its own; then, in-house EEOC Chairman, Mr. Fred Myers, and Mr. Cracchiolol, neither of whom I had at any time ever worked.

178. Mr. Myers had been the Assistant to a Mr. William Taville, who had up to shortly following my August 1993 transfer to the PA's TB&T Unit been the Chairman of the PA's said

in-house EEOC Office.  Mr. Taville had gotten back in touch with me just prior to the Defendant CWA's having effectuated my said third (3rd) continuous extension of my said scheduled one (1) year probation period with it.

179.  Prior to this, and following the PA's having retaliated against me; for my having not pretended that I had been, in fact, hired by it in the above said false capacity, I had made numerous desperate pleas for assistance.  I had pleaded to CWA, Ms. Linda Hughes of the PA Human Resource Department as well as to its EEOC Office.  At the time, Ms. Hughes had been the only one to have made herself available to me and had after an initial discussion with her told me that I should never have been made to have tolerated such treatments and advised me, further, that she would be getting back to me but never had.

180.  My next contact with Ms. Hughes had been based upon my having inadvertently run into to her in the PA's Cafeteria and subsequently approached her, at which time she had stated to me; exact quote, "If you want to keep your job, you're going to have to kiss Tony's butt".

181.  Following this, Mr. Taville had set up a meeting Ms. Williams, Ms. Doreen Smith, and I.  Ms. Williams and Ms. Smith had both been similarly situated Black woman whom had substantially disrespected, harassed and otherwise dehumanized in manners and degrees to which the PA would never have permitted them to treat its white employees.  Although Ms. Williams had indignantly falsely alleged that I had been hired as her backup and Mr. Cracchiolo had subsequently openly yelled the same lie at me and immensely humiliated be because of, I had not; still, not really understood until then that the PA had been, in fact, utilizing Ms. Williams and Ms. Smith against me.

182.  Mr. Taville had apprised us of his having had been with the PA for thirty-five (35) years, that the PA had always used minorities against other minorities and that; moreover, we had reacted just as it had wanted us to;

183.  In a further meeting at which Mr. Myers had been also present, Mr. Taville had advised me that he had seen a memo effectuating my termination by the PA on a Mr. Vinnie DiConzo's desk and advised him that he was not going to have allowed him to have done so because the PA had not possessed any grounds.  Mr. Taville had at that time assured me that was going to have looked out for me but had, most unfortunately; for me, retired shortly thereafter. Additionally, Mr. Taville had also told me that my employee folder with the PA had been completely empty as if I it had never employed me .

184.  While, CWA's had completely abandoned and denied me all access to it following its having effectuated the PA's said third (3rd) continuous extension of my said slated one (1) year scheduled probation period I had, the PA had relentlessly subjected me to the most excruciatingly painful, dehumanizing and disparate treatment that I had ever experienced or known.  Unable to have tolerated it, I had contacted the PA's said EEOC Office, due the PA's my.

185.   Although Mr. Myers had been fully aware as to my previously related PA experiences as he had been in attendance at my prior meetings with Mr. Taville, he had; nonetheless, required me to have rehashed everything.  Following my having done so, Mr. Myers had advised me that I had to have proved that other Blacks in the TB&T Unit; of which I had been the only one, had been subjected to discrimination in order for me to have filed a Claim with his office.  Ms. Evelyn Pohill, who had been Black and had interactions with the TB&T Unit, although not technically apart of it, had openly stated to me in the presence of Mr. Peter

50

Rinaldi, the TB&T Unit's Manager, that he had been a stone-cold racist and I had apprised him of this.

186.  Mr. Myers had subsequently sent me a memo a few days later, on which he had copied Ms. Pohill; along with countless other individuals, whom had been unknown to me, in which he had reprimanded me and stipulated that, 'my problems had been my own and that I should not have involved other's in my personal problems'.

187.  The PA had transferred two (2) of its Black employees between two extremely hostile work environments, one of whom had been me and the other had been a Ms. Patience Prebbie; now deceased, whose position I had been transferred to while she had been out on vacation and without her prior notice or consent.  Ms. Pohill's had been friends with Ms. Prebbie and this is what had had fueled her anger.  I had also known Ms. Prebbie and been friendly with her.

188.  Moreover , Ms. Prebbie had previously confided in me that Mr. Rinaldi had never spoken to her for the entire four (4) period that she had worked for him because of the Blackness of her skin and had also desperately.  Moreover, she had pleaded to me for relief from the onslaught of abuses to the PA had relentlessly subjected her, subsequent to her transfer to the position from which it had just transferred me.  In a most desperate but futile attempts to help Ms. Prebbie, as I had been powerless to have even helped myself, I had; nonetheless, pleaded to Defendant CWA on her behalf in an detailed written document that I had faxed to its Headquarters to the attention of its president but as usual had received no response, whatsoever.

189.  In a final meeting that I had most regretfully attended with Mr. Myers some time later, out of sheer desperation to the continuing relentless escalation of the same treatments and Defendant CWA's MIA status, Mr. Myers had stated to me; exact quote, "The PA had not a

51

social Organization, if you want justice you should go to a church". Similarly, in my first such meeting with him; wherein he had required me recount everything thing that he had already known in an attacking manner, Mr. Myers had advised me that Mr. Cracchiolo had not been required to have justified his un defamations and assignations of my character. Moreover, he had specifically stated to me that Mr. Cracchiolo had been a high level Executive, while I had been just a low level Secretary.

190.  I had ultimately turned to the EEO C due to my having been met with immediate and stern retaliations for my every effort to obtain reliefs from the above said treatments within the PA's establishment including its Executive Director.  Up to just days before my having received its written Decision in the PA's favor and omitted CWA from my related claim; altogether, The EEO C had continuously told me that my case had not been, yet.

191.  The EEOC Representative who had typed up my original Claim had advised me that I had, in fact, possessed a discrimination claim but that, moreover, the EEO C had really only handled Class Action Suits, EEOC's written Decision had in no way reflected his such advice to me.

192.  By its Decision, however, the EEO C deemed the PA to have been justified it in its having subjected me to a more than three (3) year continuous probation period from the date of based upon the PA's false pretext of my having been hired by it as a backup to Mr. Cracchiolo's Secretary.  Furthermore, the EEO C had also falsely alleged that due to my poor work performance in this regard I it had been necessary for the PA to have extended my said probation period, after its slated expiration date; no less, and relocated me so closer to Ms. Williams.

193.  The EEO C had also lent a blind eye to and condone the PA's, then, longstanding and relentless subjections of me to purely racially based withholdings, subjugations and other

52

cruel and harsh mistreatments as it's clearly retaliatory termination and racially motivation December 1995 termination of my employment with it. Furthermore, it had alleged the PA to have been justified in its such actions based upon the above stated as well as, contradictorily, my position with the PA having been allegedly abolished because a reduction in its workforce.

194.  The EEO C had sent me copies of never before seen by me documents that the PA had falsely alleged to have issued me but never had, amongst which had been documents from Mr. Rinaldi; who I had worked for the longest up to that point and been exceedingly cruel to me. In totally contradiction to the EEO C's pretexts for its clearly and deliberately biased and erroneous Decision, nonetheless, repeatedly asserted in the said documents that he had never had any problems with the quality of my work. In fact and in contradiction to

195.  Furthermore, as to the PA's having allegedly abolished my said position due to a Reduction in Force by it my position had been immediately filled by a Ms. Kathleen Foley, immediately subsequent its said malicious, retaliatory and deliberately racist December 1995 wrongful  termination of my employment with it.

196.  Additionally, although I had only filed one form, somehow I ended up with two (2) forms with two dates; neither of which had included Defendant CWA.  Moreover, Mr. James Bailey (Black) of CWA shortly before the 2001 destruction of the former One WTC and inadvertently discovered that the PA had been underpaying me from the date of its having hired me as a Secretary without Steno.  Instead of its having paid me as a Secretary with Steno in which capacity it had hired, tested and utilized me in, I had been paying me as a Secretary without Steno.

197.  Further to which , Mr. Mr. Bailey had been adamant about his having gotten me properly paid as well as maintained contact with me in regards to his progress.  Upon my having

finally made contact with him again, following is having; suddenly begun stonewalling me; however, stated to me; exact quote, "You never told me that you sued the Union". As if to have said that I had no longer been entitled to have been properly paid by the PA because of my having done so, even though CWA had, long since then, continued to have collected its membership dues from my every paycheck; for services never rendered, no less.

198. I had, then, took the matter up with Ms. Bernice Krawzic,, who had been the Engineer Department's CWA Representative for all but the first year or two of my said seventeen and one-half (17 ½) years with the PA and I had been certain had told Mr. Bailey, as she had always acted and spoken in CWA's own and the PA's the sole best interests; while against me. In response, Ms. Krawciz had stated to me that 'it had not mattered any longer because the PA had stopped using Steno'.

199. Mr. Crachiolo had confirmed his prior such assertions and accusations against me to have been wholly false by the following contradictory admissions that he had made in his testimony given in my said prior related EEO Commission Civil Case (See *97-CV-2477*) that:

(a) I had for the overwhelming majority of my said original one (1) year probation period I had been stationed immediately next to and supervised by Mr. Valletta on the 74th Floor of the former WTC, while Ms. Williams had been stationed on the 73rd Floor of the former WTC,

(b) Ms. Williams had not at any time during that period assigned me any work, and

(c)I had been the sole Secretary to an upwards of fifty (50) Professionals.

200. As a prerequisite for its having been able to have terminated, rather than made me permanent at the said slated one (1) probation periods ending, let alone subsequent to it, the PA own related policies and procedures required it to have met certain criteria, which it had not.

While CWA's own related policies and procedures had required the PA to comply with them. Nonetheless, however, CWA had made no effort, whatsoever, to have the PA accountable to its own such policies and procedures but had, instead, thoroughly victimized me.

201. The PA's such related policies had required it to have, firstly, apprised me apprised me of any of my deemed shortcomings by it.

202. Secondly the PA's such policies and procedures had required it to have held and documented a series of related consultations with me apprising me of my progress and/or lack thereof, neither of which had ever never taken place.

203. Other than the said Senior Secretary position that I had been blackmailed into my having held until the PA had selected a candidate but not been permitted to have applied for and the scanning evaluations, the PA never given me an evaluation; throughout the entire longstanding period of my tenure with it. It had not at any other time, throughout my said approximate seventeen (17 ½ ) years tenure with it, ever known or cared to have known the volumes, sources, or qualities of the work that I received and/or performed or given me any other evaluations.

204. Moreover, the PA had permitted virtually every white employee in the Units to which I had been assigned had by it to have directly assigned me work, with the exceptions of my brief periods under Mr. George Hogan, Mr. Jerry Dinkels as my immediate Supervisors and Ms. Louise Burke as the Department Administrator under whom I had been temporarily assigned.

205. Up to the my late October 1997 Return to Duty with the PA the said late December 1995 wrongful, retaliatory and racially motivated termination of my employment with it, it and CWA had approved and enforced the withholding of my every CWA mandated increase; from

my February 10, 1992 date of my having been hired by the PA.  Moreover, the PA had required

and CWA had condoned and support my having been burdened with the lion's share of the work

and never given me a raise, while it having consistently afforded both to the similarly situated

white employees whom I had been required to have trained and made subservient.

206.  In response to my having  brought this to the PA's attention, I was told by it 'that it

had not cared who had done what, so long as the job had gotten done'.

## STATEMENT OF FACTS

1.    I was at approximately 3:30 p.m. in the afternoon of September 18, 2008

approached at workstation on the Third Floor of Three Gateway Plaza in New Jersey by Ms.

Jane Hegarty, Manger the PA's Engineering Department; while my having been in the process of

performing my work and ordered by her to have accompanied her into the Conference Room.

2.    I had been fearful and advised her that I had wanted a CWA Representative to have

been present, due to the extensive computer hackings, attempted physical aggressions and overall

extensive and longstanding relentless corruptions against me by the PA.

3.    Ms. Hegarty had, then, threatened me that she was going to have openly read from a

sheet of paper that she said she had intended to have given me that unless I had immediately

accompanied her,.  Having felt completely overwhelmed, humiliated, dehumanized, agonized,

traumatized, deeply saddened and fearful, I had just sat there and shrugged my shoulders.

4.     Following Ms. Hegarty's having, then, walked away; I had begun calling

desperately trying to have contacted the Union Show Stewart, Ms. JoAnn Hilton, to no avail.

Ms. Hegarty had, then, again approached my workstation approximately ten (10) minutes later

and informed me that she had gotten in touch with Ms. Hilton and that she had been on her way

and I had at that time accompanied her to the said Conference Room.  Once there, Ms. Hegarty

had advised me that I was being as of that moment issued an Immediate Suspension without Pay

for unspecified violations of its rules General Rules and instructed me to have provided her with

my I.D., shut off my computer, and to have left PA property immediately; in violation of my

rights under.  Moreover, she had threatened me with her having had me physically escorted off

of PA premises unless I had left it immediately.

## INJURIES

The alleged related after-the-fact Charges and alleged justification for the PA's and Defendant

CWA's such action against me are wholly fabricated and falsified and I was, therefore,

deliberately maliciously robbed by the PA and Defendant CWA of my job, my livelihood, my

peace of mind, my dignity and my stability

1.     Undue loss of income, future income opportunity and related more than $6,000 debt
incurred

2.     I have, to date, not been afforded my due long overdue related Severance Pay in

excess of $16,000.00 after taxes.

3.     Defamation and Assignation of Character

4.     Harassment

5.     Retaliation

## REQUEST FOR RELIEF

6.   **Make whole relief.** The action(s) taken against me by the PA had been truly extensive, intentionally and maliciously most destructive to me and my life while for no just cause, whatsoever, and can only be sustained by further frauds, corruptions and abuses of power and injustice. Therefore I humbly plead to this Court for "make whole" relief.

7.   **Front Pay.** Given the truly tremendous, inconsolable and irreconcilable deliberate malicious and purely egotistical and racially motivated cruelties, undue pains, sufferings, hardships, losses, harassments and retaliations and the extended period of time over which the PA has heaped them upon me; not to mention its expertise in frauds and corruption and insatiable appetite for revenge, it would not feasible as well as a most perilous proposition for me to ever return to PA employment.  Therefore, I plead to this Court for front pay.

8.   **Back pay.** The PA acted as Judge, Jury and Executioner and denied me any due process, whatsoever, as well as its having most maliciously denied me the opportunity to have, even, regrouped by its having; to date, no provided me with long overdue Severance Pay, I plead to this court for back pay.  It had with deliberately malicious impacted my pension, in addition to its having ruined for an opportunity and related personal business opportunity for which I had taken a more than $6,000.00 loan out, the $500.00 down payment of which had been taken out of my account on the same September 18, 2008 its wrongful and deliberately malicious action against me.  Therefore, I plead this Court for Back pay as well as that it should include an amounts for the above said load debt that the PA's caused me to have incur as well as the lost potential income that it caused me with respect to my having purchased my own business along with affected retirement and pension funds.

9.    **Compensatory damages**. Given the absolute cruelty, malice, vengeance, total disregard and disrespect with which the PA has used, abused, and misused its truly excessive, powers,  wealth and undue esteem as well as corrupted countless others to have so thoroughly violated, trampled upon and destroyed me for my refusals, unwillingness and inability to acquiesce to its precepts of self-deemed racial superiority over me.

10.    I have been subjected to a grossly undue defamation and assignation of my character and made to have endured related and immensely personally destructive abuses and impacts upon my life, person, and physical well being by and because of the PA treatments of me that feel as though they have expanded over a lifetime, I; therefore, plead to this court for Compensatory damages in the amount of Ten Million Dollars ($10,000,000) in order that:

- the related loss felt by the PA shall be greater than merely its pride,

- to truly put a real dent in the perception treatment of us as being partial Human Beings and/or sub Human, and

- I may be vindicated as a fellow Human Being, truly live and breathe; once again, and start my life anew.

11.    **Punitive damages** I plead to this court to inflict upon the PA punishment commensurate to the truly life-altering, irreconcilable, irrecoverable, inconsolable, pains, injuries, harms, hardships, losses and destructions that it has so deliberately, relentlessly, cold-heartedly and maliciously enforced upon me with impunity.

12.    Even on top of all the herein described and truly tremendous violations that the PA had committed against me for so very long and its having, moreover, withheld my Severance Pay to this date, the PA still continued to have subjected me to harassments.  It billed me monthly for alleged overpaid Vacation with interests, as if it had been a utility company.  When, in fact, it

had put me out work for a total of more than six (6) months in 2008 and not permitted me to have utilized, even the Vacation time that I had already earned.  Moreover, it refused to have responded to my related written request that it specify its basis and authorization for doing so.

13.    Additionally, it had subjected me to the further harassment of its having not discontinue my insurance and terminated my employment with it until late 2009 but billed me for thousands of dollars in dental expenses under the pretext of its having done in 2008.

14.    Moreover, still, its Arbitrator had billed me for over $7,000 for alleged Hearings that they had exclusively held against and I had not been a party to.  So, here too I plead to this Court for Punitive Damages in the amount of Ten Million ($10,000.000).

15.    **Liquidated damages.** Three statutes allow a court, in specific circumstances, to award liquidated damages equal to the amount of back pay: Equal Pay Act, Age Discrimination in Employment Act (ADEA), Family and Medical Leave Act (FMLA).  I please to this Court for Liquidated Damages in the amount of Ten Million Dollars ($10,000,000.00).

16.    **Attorney fees.** I do not have any attorney as of this time but I am requesting Attorney fees in the event that I am able to secure one as well as recovery "costs".

17.    A prevailing plaintiff can recover attorney fees under Title VII, the Age There are truly no words with which I am able to, even, vaguely convey the extents and types of personal devastation, damage, loss and complete and irrevocable changes and impacts that have taken place within me as a Human Being as well as my in life resulting from Defendant CWA's having not only deliberately failed and refused as well as denied me any and all of my related rights and protections against the PA's having so relentlessly and extensively enforced upon me the precepts and constraints of racism but; in between its very extensive periods of its having denied

18.   me any and all access to it, whatsoever, its having also made allowances, excuses and justified the PA's having been within its right to have done so based upon its Job Descriptions having allegedly been at will.

1.   These acts are truly immeasurable, irrevocable and vile acts system racism against the powerless masses; that are as great loop-holes would have it, merely plucked off and victimized on individual bases. This is very particular those of use whom descend from the Africans, whom were robbed from their native African, reclassified, regarded and treated as sub Human Beings. This is wholly unjustified and unnecessary outright destructions of fellow Human; Beings, on the sole basis and pretexts of racial superiority and will continue to be openly and rampantly carried out as well as perpetuated against the individuals of the affected classes, unless this Court finally, clearly and firmly steps in, acknowledges, proclaims and enforces that:

- we are all Human Beings and, as such, unconditionally and equally entitled to as well as in need of our common related rights, and

- wherein they are unjustly withheld from us, denied to us, and or violated and abused by others, we are entitled to restitution commensurate with the resulting Human damage and suffering caused and deliberately malicious intent.

2.   Racism against us Blacks, most particularly those of us whom descend from the Africans forcibly ripped from their native motherland and enslaved by the United States, has been sustained, maintained, and continues to be enforced and perpetuated against us by it in a multitude of ways to this very day. Corporate America, which we maintained dependent upon made largely dependent upon for our day-to-day survival, enjoys great-related successes at our expense; by means of the United States said continued enslavement of us.

61

3.     It is not stipulated in its written corporate policies and procedure, as the United States white establishment chooses, tends to look upon and deal with their past enslavement of our African Ancestors as having been inconsequential and continued enslavement and racism against us Blacks and, most importantly, their Descendants as non-extent as well as its birthright. Racism and slavery against us is still the maintained  as the mode of the day by corporate America as well as the American white establishment at large,  via its open and unchallengeable related such practices.

4.     I say unchallengeable because those of us whom do speak out against and/or seek reliefs from the resultant pains, sufferings and hardships of racism are subjected to immediate retaliations; including but not limited losses of our incomes and abilities to provide for our own selves, families, loved and ones basic needs and are, moreover, totally left out in the cold.

5.     Via the exceeding powers and privileges that politically well-connected, systemically racist and wealthy Corporations, Companies, Organization are afforded; such as, the PA and CWA, these entities are given free rein to and do act as Judge, Jury and Executioner over their Black employees.  In light of this, entities such as the PA and CWA are able to  deter, intimidate and discourage those of us being made subject to racial discrimination by them and prevent us from our discussing or describing, even; let alone in any way demonstrating or complaining about the irreconcilable depths of related inconsolable Human anguish, pain, sufferings, and hardships that result from unchecked and unchallenged racism and/or their rightful/natural albeit; in most instances, only secretly spoken, objections and aversion to it, and are not in any made subject to any meaningful challenges, consequences and/or deterrence for their most despicable and destructive injustices against us,

6.      We are still regarded, treated and discounted as mere commodities; by various interconnected means and mechanisms, rather than our being accorded the true value that we unconditionally represent and are unconditionally entitled to as fellow Human Being.  We actually represent the cradle of Humanity and beginning of Human Life, So how truly ugly it is that those whom have come after us, through us and only because of us should, then, deem themselves authorized to rearrange our values of that of being worth less than a dog.  Clearing this is a great untruth and tragedy that must and does stain the entire world.

7.      Systemically racist Organizations such as CWA/the PA are further aided by the EEO Commission, which merely falsely purports itself as a being a defender, protector of individuals whose common Human Rights are unjustly denied, withheld, abused and otherwise violated and trampled upon as well as holding accountable and making us whole against those whom so violate and abuse us.

8.      Based upon my own personal applications to the EEO Commission for its assistance and related experiences as well as in-depth analysis, I cannot help but find there to exist truly great contradictions between its alleged and purported mission(s) and the ends towards which it actually operates and functions.  Among other things, the EEO Commission alleges and purports its mission and functions to include those of its providing shelter, protections, and reliefs to fellow Human Beings whom apply to it for same; based upon their such rights having been denied, restricted, abused, violated and otherwise trampled upon by others.  In stark contradiction, however, it has in its related dealings with me; instead:

- repeatedly disregarded, conveniently omitted and deliberately misrepresented the true facts of the matter(s) at hand along with any substantiating evidences

submitted to it that could have, would have, or should proved beneficial to me and my related claim(s) and/or detrimental to those about whom I had complained to it,

       - deliberately failed and refused to have investigated the appropriate records and/or individuals in relation to my specific complaints,

       - supported its clearly biased and erroneous Decision(s) with provably false assertions and/ or by means of its merely alleging the parties against whom I had complained to it to have provided it with unspecified refuting evidences.

    9.    Furthermore, the EEO Commission's has in relation to its dealings with me fiercely dedicated to its; instead

       (a) protecting, saving as harmless, and shielding the exceedingly powerful, privileged, and politically well-connected Corporations, Organizations, Companies, etc., that design, maintain, enforce, perpetuate, and greatly profit from systemic racism against the United States Black Citizens; while most particularly, those of us whose Ancestors were ripped and robbed from their native Africa and enslaved, redefined, regarded and treated as sub-Human Beings by it, against even the possibility of their being faced with any related consequences, and

       (b) serving and assisting as a catalyst for the related relentless retributions to which we are subsequently subjected for our having sought their relief, while with virtually no where else to turn.

    10.    We are all Human Beings and, as such, possess, are in need of and entitled to the very same inalienable basic common Human Rights as is everyone else. Even so, nonetheless, the EEO Commission had in the midst of its ulterior motive and objective, furthermore, insidiously acted to have impressed upon me; as had Defendant CWA, that my Human Rights had been at the sole discretion of those about whom I complained to it about having violated,

abused, denied and withheld them from me and; furthermore, non-existent except to the extent(s) afforded to me by them.

11.    Given the above stated facts and realities as to the alleged but false and non-existent, there are virtually no real earthly resources and recourses made available to us, the Black African-Salve Descendant mass, whom are individually compelled to and restricted, withheld and controlled by racism. Yet, we are referred for related justices and reliefs to those whom vigilantly protect our violators, instead.  So, there are essentially and realistically virtually consequences enforced against those whom deny us our Human Rights, withhold and dehumanize us and rob us of our potential, worth and joy of life in the process.  Therefore, as previously stated, these most gross, inconsolable, and irreconcilable injustices and Human destruction will inevitably continue to be committed and imposed against us by United States unless and until this country and this Court clearly, firmly, realistically and finally acknowledges us as One Hundred Percent (100%)  Human.

## CAUSES OF ACTION

### ADA Violations, Harassments, and Dehumanization:

1.    Scleroderma is a very serious ADA protected life-threatening, chronic illness that can at times be physically and otherwise most debilitating to me, particularly with regard to my being exposed for any extended periods to: (a) concentrated cold air, cold weather, in particular, as well as temperature extremes, (b) extensive walking, and (c) bending and/or lifting.

(a)    I had never prior to my having become employed by the PA, even, heard of Scleroderma or experienced any of its related symptoms; which just happened to have increasingly progressed simultaneous to the levels of personally dehumanizing and violating treatments that the PA had relentlessly imposed upon me.  Given that the relentless enforcements

of such abuses and violations upon any Human Being can be classified as their merely being

subjected to stresses, only in the most ridiculously conservative of estimations;  while all types of

stresses are known to exacerbate the conditions as well as symptoms of Scleroderma, I truly

believe the PA to  have been causative of  it.

Family Medical Leave Violations and Related Denials of ADA Protections/Accommodations

      1     I had been entitled to accommodations based upon Scleroderma having been/being

an ADA protected illness as well as in need of certain ones due to its nature but had been denied

them.  Additionally, the PA had utilized its denials of my such rights as means of its having

enforced upon me related undue hardships, penalizations, losses, suffering and other racially

disparities.

      2     The PA repeatedly denied me my ADA related rights, protections and

accommodations under the Family and Medical Leave Act.  It had, instead subjected to me to

unrelenting related denials, retaliations, dehumanization, penalization, and harassments;

including but not limited to its having repeatedly required my personal Physician to have

reworded it her the related Family and Medical Leave Request form(s) to its liking only to have,

then, denied me my each and every such request.

      3     Ms. Robin Martin of the PA's Medical Department subjected me to personal

violated and invaded my ADA right to privacy by her having faxed my personal and confidential

Physician Completed and signed Family and Medical Leave Form  to Ms. Jane Hegarty, the

Manager of its Engineering Department, on two (2) separate occasions.

      4     Following each such occasion Ms. Jane Hegarty's having been faxed the above said

personal and confidential Family and Medical Leave Form by Ms. Robin Martin of the PA's

Medical Department, Ms Hegarty had, then, subjected me to further violations and denials to me

of my related ADA rights.  Ms. Hegarty had acted as her having been not only a Physician but also my personal Physician's ( Dr. Perville) Department Head by her having required Dr. Perville to repeatedly reword the said form to her liking.  Subsequently, Ms. Hegarty had on each such occasion, then, continued its denials to me of each and every the ADA related that had been Dr. Perville had therein requested on my behalf.

ADA Harassment and Retaliation

1    The PA had enforced upon me its at will and alleged policies, procedures, restrictions and punishments related to and including usages of my, then, already banked Sick time and other benefits as means of its having utilized against medical limitations related to an ADA protected illness.  It had denied to me any and all of my ADA related rights, protections and accommodations and, instead, utilized my such illness against me as,  yet, another means by which it had unrelentingly ostracized me, dehumanized, caused me deliberate personal pain, harms, hardships, suffering and otherwise subjected me to racially disparate treatments.  This had also included but not been limited to its unrelenting subjections of me to related physical pains and discomfort, harassments, retaliations, withholdings, unequal and unfair pay, thefts of pay, and subjugations to its similarly situated white employees.

2    I had been unable have obtained diagnosis as to my affliction with Scleroderma until shortly after the PA' late December 1995 wrongful and racially motivated termination of my employment with it because of its above said unrelenting daily treatments of me.

3    Immediately upon my Return to Duty with the PA in 1997 from its said wrongful and racially motivated December 1995 termination of my employment with it, my affliction with Scleroderma and related restrictions had been made known to the PA and CWA as well as documented by theme.

4    Up to the and throughout the date of the PA's said late December 1995 wrongful and racially motivated termination of my employment with the it I had succumb to never-before experienced physical illness that had progressively increased; simultaneous to its unrelenting of me subjections of me to most dehumanizing, abusive, disparate and blatantly racist treatments.

5       My symptoms had become so severe and unpredictable, in fact, that the PA's own

Medical Department had at one point, even, rushed me to the hospital against my will due to my

vital signs having been so erratic and following my having been suddenly overwhelmed by an

episode and disabling pains that had passed after several hours.

6       I had never experienced such an array of sudden, debilitating and unexplainable

physical pains, illnesses and related sufferings; or, even, heard of Scleroderma, prior to my

having been so unrelentingly exposed and subjected by the PA to such ruthless, dehumanizing

and anguishing treatments.  Moreover, Scleroderma does not run in my family and is, moreover,

exacerbated by all types of physical, emotional, and mental traumas and stresses. Based upon

this along with all the previously related stated facts, I genuinely perceive and believe the PA to

have to have been causative of my affliction with Scleroderma; owed to the previously stipulated

most abusive and personally damaging treatments to it had unrelentingly subjected me.

7       The PA had denied my personal Physician, Dr. Mona Perville, each and every ADA

mandated accommodation and related Family and Medical Leave request that she had made to it

on my behalf, from the time of my said October 1997 reinstatement with it up to its wrongful and

deliberately malicious September 18, 2008 action(s) against me.  It and Defendant CWA had

unrelentingly violated my related rights by their having, instead, by varying means, complictly

maliciously subjected me to related unrelenting harassments, dehumanization, ostracizations,

undue penalizations and thefts of my pay by their having taken advantage of my related

deliberately utilized against me, failed and refused to have accommodated my related

vulnerabilities,.

8      In deliberate harassment and intention to have caused me the related personal pain and suffering that it had, the PA assigned me to a workstation that had been situated directly under a number of air vents.  The said thermostat for the said air vents had been located in cubicles assigned to others of the PA's staff members and had been known by it to have been deliberately tampered with; which had been verified via a related email that Ms. Marcia Moore, the Administrator of the its Engineering Department had copied me on.

9      In response to my related pleas the PA, I had been directed that I was *not* to have complained about my medically related limitation anymore, by Ms. Demarest, my, then, Supervisor in its Contract Unit.  Having so advised me openly, Ms. Demarest had further advised me that 'my medical condition' had been my own personal problem, I had been responsible for taking the necessary precautions and to was to have brought an extra set of clothes into work; if necessary.  Further to which, I had already been wearing double to triple everything on an everyday basis due to the said related deliberate harassments against me by the PA and had not been required to have done so at home.

10      Ms. Demarest had held the position of Assistant to Ms. Jane Hegarty prior to her having been promoted to the Contract Unit as my Supervisor sometime in 2006, I believe and had been very cruel to me and from the very onset of her said promotion; then, unbeknownst to me, engaged in and plotting treacheries against me.

11      As an added and deliberately hardship by the PA, particularly given its having been aware as to my walking limitation related to Scleroderma, it had transferred me from my place of resident in New York to New Jersey in order to have maintained and made seemingly justifiable its unrelenting and racially disparate treatments of me.

12    The PA had denied me participation in its related common practice as well as denied me the ADA accommodations, rights and protections that I had been entitled and; while its having; instead, enforced upon me undue related penalizations, hardships, pains and suffering.

13    I had been uniquely micromanaged by the PA and it had, among, other things, , docked me for as little as two (2) minutes lateness and otherwise and ostracized me.

14    Moreover, the PA had refused and denied me participation in, even, five (5) minutes of the half (½) hour and more grace period that had been a blatant common practice afforded by it to all of similarly situated white employees, whom had primarily resided in New Jersey.

15    Given that the PA's Headquarters had been located in New York as well as its having possessed New, where I reside, the PA had deliberately and maliciously calculated its said abuses and violations of medically related and ADA protected limitations as well as resulting, pains, hardships, and sufferings it caused to me.

16    The PA used against me my said ADA limitations as means of its having maintained me subservient to its lesser skilled and experienced similarly situated white employees.

17    While its having simultaneously held me accountable for virtually all of the related work, the PA denied me fair and equal pay, withheld me, and denied me any and all opportunity to have advanced or made even a lateral transfer out of the its Engineering Department.

18    CWA had supported the PA's such treatment of me by its having most largely completely abandoned me and denied me any contact with it.  Additionally, on those relatively rare occasions in which it had permitted me any such access to it, CWA had consistently impressed upon me it that the PA's treatment of me had been its sole prerogative, based upon its

job descriptions having been allegedly at will.  Furthermore, CWA had, itself, justified the PA's

restriction of me to its Engineering Department based my having alleged been the only C-15

Secretary within the entire PA Organization and, therefore, unable to have made an, even, lateral

move; whatsoever.

19     Left by Ms. Demarest's previously stipulated in utter despair and at the sole mercies

of the PA employees whom had been deliberately tampering with the said thermostat control and

harassing me, I had advised Ms. Marcia Moore of my intent to have contacted and complained to

the ADA.  Additionally, I had also apprised Ms. Moore that that Ms.  Martin had violated my

ADA rights my by having faxed my personal and private medical information to Ms. Hegarty,

which Ms. Moore had returned to me to for the purpose of having  Dr. Perville reword.

20     In response, Ms. Moore had in retaliation mandated me to have been seen by the

PA's Medical Department and, specifically, its Psychologist; which I had not become aware of

until quite some time later.

21     I had been at that time performing virtually all of the Contract Unit's work, as usual

but merely unable to have tolerated the concentrated cold air harassments to which I was being

deliberately subjected by the PA.  Nonetheless, however, Ms. Moore had in her said Memo

called into question my fitness to duty and specifically requested that PA's said Medical Office

had evaluated me on that basis.

22     Moreover, the PA had asserted to me and point me to me its alleged at will policy,

as having made justifiable and seemingly plausible, its having unrelentingly and instantaneously,

abused, violated and used against me as weapons my known to it medically related and ADA

protected vulnerabilities.

23     The PA had on March 18, 2008 violated by ADA Rights by its having required me to perform Out of Class work that had been racially exclusive and racially motivated and constituted extreme abuses of my above said medically related ADA protected limitations. Moreover, the PA had exclusively assigned such work to its Black employees.

24     The PA had advised of its having intended to have as of the above said date commenced me in and exclusively and indefinitely relegated me my having been required to have: dug through and pulled out, manually documented, boxed and mailed invoices along with whatever other work it may have elected to have assigned me.

25     Moreover, the said invoices that had been jam-packed and unordered in approximately ten (10) boxes, ten (10) two (2) draw file cabinets and seven (7) four (draw) file cabinets.

26     My hands are chronically swollen and I am unable to perform any extensive writing, bending, walking or lifting because of the impacts of Scleroderma upon my extremities as well as other parts of my body.  While, moreover, the PA had been fully aware of and already caused me considerable related physical pains and sufferings by its having deliberately abused and violated my known to it limitations.

27     I had been a formerly trained as an Administrative Secretary as well as already acquired a minimum of fourteen (14) years related experience, most conservatively, as of the time of my having become employed by the PA as well as my having been hired at that time classified by it as such.  So to say that the PA had greatly dehumanized and insulted me beyond all measure by its attempted such enforcements upon me would be a grave understatement, aside from their having been prohibitive to me based upon its my known to it medical condition as well as constituted gross violations of my related ADA rights.

28    The PA had subjected me to an undue and wrongful Constructive Termination for my having advised it on In on March 18, 2008 of my inabilities already known to it inabilities  as well as unwillingness to have performed and be compelled, exclusively and indefinitely relegated by it to the above said racially motivated and racially exclusive, burdensome and demeaning work.   In an immediate retaliation, the PA had immediately mandated me to have been seen by its Medical Office on March 19, 2008 by which means it subjected, me to a more than three (3) months Constructive Termination/ without and, then, subsequently with partial pay.

WHEREFORE, it is with the deepest of humility, pain, suffering and vulnerability that I most desperately and humbly plea to this Court for justice, with my heart on my sleeves.  I pray to our mutual Almighty Creator that you will to stand up for me against those in comparison to whose powers, privileges and related complicities and conspiracies I am unable to; while no one else has thus far been willing to help me.

Defendant

Stephanie Lewis-desire
The Port Authority of New and New Jersey
225 Park Avenue South, 10th Floor
Office Equal Opportunity
New Yew York, NY  10003

*Rhonda D. Lora-Serrano*

Rhonda D. Lora Serrano

Dated:  June 15, 2008
New York, NY



## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
### New York District Office

33 Whitehall Street, 5th Floor
New York, NY 10004-2112
(212) 336-3620
TTY (212) 336-3622
General FAX (212) 336-3625

Austin F. Turner
Investigator
Phone (212) 336-3750
Fax (212) 336-3624

March 1, 2011

Ms. Rhonda D. Lora-Serrano
P.O. Box 170
Brooklyn, NY 11217

Re:    <u>Rhonda Lora-Serrano v. Port Authority of New York and New Jersey</u>
       EEOC Charge # 520-2009-04523N

Dear Ms. Lora-Serrano:

The Equal Employment Opportunity Commission (hereinafter referred to as the "Commission") has reviewed the above-referenced charge according to our charge prioritization procedures. These procedures, which are based on a reallocation of the Commission's staff resources, apply to all open charges in our inventory and call for us to focus our limited resources on those cases that are most likely to result in findings of violations of the laws we enforce.

In your Charge, you allege you were subjected to discrimination by The Port Authority of New York and New Jersey (hereinafter referred to as the "Respondent") on the basis of your race (Black), religion, and were retaliated against after participating in a protected activity, in violation of your rights under Title VII of the Civil Rights Act of 1964 as amended (Title VII). You further claim that you were discriminated against on the basis of your age, in violation of the Age Discrimination in Employment Act of 1967 (ADEA). You also allege that you were discriminated against on the basis of your disability, in violation of the Title I of the Americans with Disabilities Act of 1990 (ADA). You allege this discrimination led to your termination on or about September 18, 2008.

According to your Charge, the last date of harm in your case was your termination on or about September 18, 2008. Our records show that your initial allegations were filed with the Newark Area Office on June 13, 2009 (268 days after your last alleged harm). The Respondent is a bi-state entity and as such, is not subject to the statute of limitations that applies to most employers because the Respondent does not fall under the jurisdiction of a state Fair Employment Practices Agency such as the New York State Division of Human Rights. In accordance with the Federal statutes, and current case law, the time limitation for filing a charge against this Respondent is 180 days after the last date of harm. The time limitation for your charge exceeded the 180 day limit. Regrettably, the Commission may not act beyond the jurisdictions imposed by Federal Law.

Therefore, the EEOC is closing its investigation of this Charge and no further action will be

taken by the Commission regarding this matter.  Your Determination/Notice of Right to Sue is enclosed.  This determination is final.  If you wish to pursue this matter, you must file a law suit on your own in Federal District Court using the enclosed Notice of Right to Sue within **90 days** of your receipt of it.  Once this 90 day period is over, unless you have filed a lawsuit, you will have lost your right to sue.

If you have any questions regarding this matter, please contact Federal Investigator, Austin Turner at (212) 336-3910

Sincerely,

**Austin Turner**
**Federal Investigator**

Enc. Dismissal Notice of Right to Sue

EEOC Form 161 (11/09)

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| | |
|---|---|
| To: Rhonda D. Lora-Serrano<br>P.O. Box 170-268<br>Brooklyn, NY 11217 | From: New York District Office<br>33 Whitehall Street<br>5th Floor<br>New York, NY 10004 |

|  On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 520-2009-04523 | Austin F. Turner,<br>Investigator | (212) 336-3750 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[X] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[ ] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

### - NOTICE OF SUIT RIGHTS -

(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed **WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

_Elizabeth Grossman_                              MAR 0 1 20??

Enclosures(s)                    Elizabeth Grossman,
                               Acting District Director                      (Date Mailed)

cc:    Stephanie Lewis-desire
       Manager
       THE PORT AUTHORITY OF NY & NJ
       225 Park Avenue South, 10th Floor
       Office of Equal Opportunity
       New York, NY 10003

2

February 5, 2009


Jeanette Jimenez
US Equal Employment Opportunity Commission
33 Whitehall Street
5th Floor
New York, NY 10004


Re: Rhonda D. Lora-Serrano vs. The Port Authority of New York & New Jersey
Charge # 520-2009-04523


The Port Authority of New York and New Jersey (hereinafter referred to as "the Port Authority") submits this position statement in response to the above referenced charge and to your request for information. The Port Authority respectfully denies that it has engaged in any unlawful discriminatory conduct as alleged by the Mrs. Lora-Serrano on the basis of her race, religion, age or disability. The Port Authority also denies that it engaged in retaliation as alleged by Mrs. Lora-Serrano or violated her rights under the Equal Pay Act.

As the charge references events that allegedly occurred between February 2, 1992 and October 18, 2008, it is important to note the context under which this response is made. The Port Authority is a bi-state entity and as such, the time limitation for filing Title VII of the Civil Rights Act of 1964 runs 180 days from the date of the discriminatory event. (See *DeZaio v. Port Authority*, 205 F.3d 62, Feb. 29, 2000) Further, the United States Supreme Court has recently held that Title VII precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period. In *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 122 S. Ct. 2061, (June 10, 2001), Justice Clarence Thomas, writing for the majority of the Court stated in relevant part that:

> *"We take the easier question first: A discrete retaliatory or discriminatory act 'occurred' on the day that it happened. A party therefore must file a charge either within 180 or 300 days of the date of the act or lose the ability to recover for it.*
>
> *...Discrete Acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory*

> *adverse employment decision constitutes a separate*
> *actionable 'unlawful employment action.'*
> *Morgan can only file a charge to cover discrete acts that*
> *'occurred' within the appropriate time periods. (Id at*
> *2073) (Emphasis added.)*

Specifically, the charge of Mrs. Lora-Serrano was signed and declared by her on
September 24, 2009 indicating that the latest date "discrimination took place" was
October 18, 2008. Pursuant to the 180 ruling and the fact that the charge was not filed
until September 24, 2009 makes it untimely and justifies the charge being dismissed.

Notwithstanding the untimeliness of the charge, Mrs. Lora-Serrano was terminated for
cause. Earl R Pfeffer, Esq., Impartial Hearing Officer concluded that Mrs. Rhonda Lora-
Serrano "exhibited a level of insubordination that impeded the operations of the
Engineering Department". The Hearing Officer went on to say, "ultimately, however, it
is Lora-Serrano's acts of sabotage which compel my conclusion dismissal is the
appropriate consequence for her misconduct." (Exhibit A)  The Port Authority submits
copies of the Finding and Recommended Action submitted by Earl R Pfeffer, Esq.,
Impartial Hearing Officer, (Exhibit A).  Also included are transcripts of Rhonda Lora-
Serrano's hearing, dated October 24,2009 (Exhibit B), January 27, 2009 (Exhibit C) and
February 20, 2009 (Exhibit D). The exhibits submitted provide details of Mrs. Lora-
Serrano's job history with the Port Authority and the reasons for her termination.

The Port Authority submits the charge of discrimination is time barred. Mrs. Lora-
Serrano failed to demonstrate any specific acts of discrimination by the Port Authority
that violate her rights secured under Title VII of the Civil Rights Act of 1964 (Title VII).
Mrs. Lora-Serrano failed to demonstrate any acts of retaliation on the part of the Port
Authority and she failed to demonstrate any violation of her rights under the Equal Pay
Act. Thus, it is respectfully requested that Mrs. Rhonda D. Lora-Serrano's claim of
discrimination be dismissed in its entirety.

Sincerely,

Stephanie Lewis-Desire
Manager
Office of EEO Compliance and Diversity Programs
Human Resources Department

# MEMORANDUM

TO:          Rhonda Lora-Serrano
FROM:        Jane Hegarty, Assistant Director
DATE:        September 18, 2008
SUBJECT:     **Suspension Without Pay**

cc:    F. Lombardi, D. Berger, K. Hoppe, P. Miller, M. Moore, B. Smith, P. Zipf,
       R. Williams

Effective immediately, you are suspended without pay pending the completion of disciplinary action arising from your violation of the General Rules and Regulations for All Port Authority Employees. This action is in accordance with Article XIX of the Memorandum of Agreement between the Port Authority and the CWA-Local 1032.

Formal disciplinary charges are being prepared and are based in part upon your continued and repeated acts of insubordination, which are in violation of the General Rules and Regulations.

You will receive formal Charges and Specifications from the Port Authority Law Department, and you will be informed of the date, time and location of the disciplinary hearing.

Jane Hegarty, P.E.
Assistant Director
Engineering Management Services

Received By:

Rhonda Lora-Serrano

Date: September 18, 2008